# No. 26-1248

# United States Court of Appeals
## for the Fourth Circuit

CareFirst of Maryland, Inc.; Group Hospitalization & Medical Services, Inc.; CareFirst BlueChoice, Inc., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*

v.

## Johnson & Johnson; Janssen Biotech, Inc.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Eastern District of Virginia
(No. 2:23-cv-00629-JKW-LRL, Judge Jamar K. Walker)

## BRIEF OF COMMITTEE TO SUPPORT THE ANTITRUST LAWS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

Deborah A. Elman
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 28th Floor
New York, NY 10005
(212) 398-0055
*DElman@GarwinGerstein.com*
*President, Committee to Support the Antitrust Laws*

Zachary J. Freese
David M. Cialkowski
ZIMMERMAN REED
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
800-755-0098
*Zachary.Freese@zimmreed.com*
*David.Cialkowski@zimmreed.com*
*Counsel for Amicus Curiae Committee to Support the Antitrust Laws*

Geoffrey H. Kozen
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
(612) 349-8500
*GKozen@RobinsKaplan.com*
*Co-Chair, COSAL Amicus Committee*

Kristie A. LaSalle
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S. #2200
Minneapolis MN 55401
*(*612) 339-6900
*KALaSalle@Locklaw.com*
*Co-Chair, COSAL Amicus Committee*

*June 22, 2026*

1

# TABLE OF CONTENTS

Page

INTEREST OF AMICUS ................................................................................... 1

INTRODUCTION ............................................................................................. 3

ARGUMENT ..................................................................................................... 7

I. Decades of Supreme Court Precedent Establishes That Monopolization Only Requires General Intent. ............................................................. 7

II. Section 2 Is Structured Around Exclusionary Conduct and General Intent Serves That Structural Purpose. ......................................... 12

III. Requiring Specific Intent Would Hinder Private Enforcement by Causing Evidentiary Barriers to Unlawful Monopolization Claims ............... 15

IV. The District Court's Decision to Impose a Specific Intent Requirement Misreads This Court's Opinion in *2311 Racing*. ............................... 19

CONCLUSION .............................................................................................. 21

CERTIFICATE OF COMPLIANCE ............................................................. 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2311 Racing LLC v. NASCAR, LLC,*
139 F.4th 404 (4th Cir. 2025) .......................................... 4, 5, 19, 20, 21

*Abcor Corp. v. AM Intern., Inc.,*
916 F.2d 924 (4th Cir. 1990) ....................................................... 9, 11

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.,*
910 F.2d 139 (4th Cir. 1990) ............................................................. 11

*Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.,*
456 U.S. 556 (1982) ............................................................................. 15

*Am. Tobacco Co. v. United States,*
328 U.S. 781 (1946) ............................................................................... 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 ............................................................ 6, 10, 13, 16, 19

*Bd. of Trade of City of Chicago v. United States,*
246 U.S. 231 (1918) ....................................................................... 14, 16

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) ............................................................................. 15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ............................................................................. 14

*California v. Am. Stores Co.,*
495 U.S. 271 (1990) ............................................................................... 1

*Carefirst of Maryland, Inc. v. Johnson & Johnson,*
745 F. Supp. 3d 288 (E.D. Va. 2024) ................................................ 3, 4

*Drinkwine v. Federated Pubs., Inc.,*
780 F.2d 735 (9th Cir. 1985) ........................................................... 6, 12

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
 122 F.4th 120 (4th Cir. 2024) ...................................................... 7, 13

*E. I. du Pont de Nemours & Co. v. Kolon Indus.,*
 637 F.3d 435 (4th Cir. 2011) ............................................................ 11

*FTC v. Meta Platforms,*
 775 F. Supp. 3d 16 .................................................................. 13, 17

*Graphic Prods. Distribs., Inc. v. ITEK Corp.,*
 717 F.2d 1560 (11th Cir. 1983) .................................................. 14, 16

*Greenville Publishing Co. v. Daily Reflector, Inc.,*
 496 F.2d 391 (4th Cir. 1974) ..................................................... 11, 17

*Kobe, Inc. v. Dempsey Pump Co.,*
 198 F.2d 416 (10th Cir. 1952) .......................................................... 10

*McWane, Inc. v. FTC,*
 783 F.3d at 814 (11th Cir. 2015) ............................................... 13, 14

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
 473 U.S. 614 (1985) ........................................................................ 1

*Novell, Inc. v. Microsoft Corp.,*
 505 F.3d 302 (4th Cir. 2007) ........................................................... 21

*Novell, Inc. v. Microsoft Corp.,*
 731 F.3d 1064 (10th Cir. 2013) ............................................. 12, 13, 16

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
 555 U.S. 438 (2009) ....................................................................... 20

*Pfizer, Inc. v. Gov't of India,*
 434 U.S. 308 (1978) ....................................................................... 15

*Ramos v. Louisiana,*
 590 U.S. 83 (2020) ......................................................................... 21

*Reiter v. Sonotone Corp.,*
 442 U.S. 330 (1979) ....................................................................... 15

*Standard Oil Co. v. United States,*
221 U.S. 1 (1911) ....................................................................... 7

*Swift & Co. v. United States,*
196 U.S. 375 (1905) .................................................................... 9

*Times-Picayune Pub. Co. v. United States,*
345 U.S. 594 (1953) ............................................................ 8, 9, 10

*United States v. Aluminum Co. of America ("Alcoa"),*
148 F.2d 416 (2d Cir. 1945) ...................................................... 8, 13

*United States v. Google LLC,*
747 F. Supp. 3d 1 (D.D.C. 2024) ................................................... 14

*United States v. Google LLC,*
778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................... 13

*United States v. Griffith,*
334 U.S. 100 (1948), *overruled on other grounds by
Copperweld Corp. v. Independence Tube Corp.*, 467 U.S.
752 (1984) ............................................................................ 7, 9

*United States v. Grinnell Corp.,*
384 U.S. 563 (1966) .................................................................... 7

*United States v. Topco Assocs., Inc.,*
405 U.S. 596 (1972) .................................................................... 1

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko,
LLP,*
540 U.S. 398 (2004) ............................................................... 11, 12

**Statutes**

15 U.S.C.
§§ 1-7 .................................................................................. 1
§ 2 ........................................... 3, 5, 6, 8, 9, 11, 13, 14, 18, 21
§§ 12-27, 29 U.S.C. §§ 52-53 ...................................................... 15

## Other Authorities

American Antitrust Report: Class Actions in Federal Court
2, 13 (Apr. 2026), available at:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6617
318 ...................................................................................................2

Areeda & Hovenkamp, *Antitrust Law: An Analysis of
Antitrust Principles and Their Application* ¶ 651c.1 (4th
ed. 2024) ...........................................................................................9

COSAL, https://www.cosal.org/mission-history .......................................1

Robert H. Bork, *The Antitrust Paradox: A Policy at War with
Itself* 160 (1978) ........................................................................... 6, 17

Robert H. Lande & Joshua P. Davis, *Benefits From Private
Antitrust Enforcement: An Analysis of Forty Cases*, 42
U.S.F. L. REV. 879, 892, 897–98, 905–06 (2008).................................2

U.S. Const., Art. III, §1 .........................................................................21

# INTEREST OF AMICUS

"Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise" and "are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Since its 1986 founding, the Committee to Support the Antitrust Laws ("COSAL") has been an independent, nonprofit corporation devoted to preserving economic freedom by preventing, remediating, and deterring anticompetitive conduct.[1] COSAL advocates for the enactment, preservation, and enforcement of a strong body of antitrust laws, which it accomplishes through legislative efforts, public policy debates, and by serving as *amicus curiae.*

Private litigants have a well-recognized role in enforcing antitrust laws and protecting economic competition. *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990); *Mitsubishi Motors Corp. v. Soler Chrysler-*

---

[1] No COSAL member whose firm is counsel for a party had any involvement in the organization's decision to file this amicus brief. No party's counsel authored this brief in whole or in part, nor did any party, party's counsel, or other individual contribute money intended to fund preparing and submitting this brief. All parties have consented to the filing of this brief.

*Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("Without doubt, the private cause of action plays a central role in enforcing this regime."). The federal government cannot prosecute every violation of federal antitrust laws, nor has the federal government traditionally seen its role as compensating the victims of antitrust violators. Private enforcement fills this gap.[2] From 2009 through 2025, private antitrust class actions resulted in the recovery of over $51.8 billion in compensation.[3] Without private litigants, many antitrust cases would necessarily escape prosecution due to the limited resources of the Department of Justice and Federal Trade Commission.

COSAL, as a proponent of robust private enforcement of the nation's antitrust laws, thus has a strong interest in the outcome of this important appeal.

---

[2] *E.g.*, Robert H. Lande & Joshua P. Davis, *Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. REV. 879, 892, 897–98, 905–06 (2008) (reviewing 40 successful private antitrust cases and finding that of the $18–19.6 billion recovered for victims in those cases, almost half of the total recovery came from 15 cases that did not follow government actions).

[3] American Antitrust Report: Class Actions in Federal Court 2, 13 (Apr. 2026), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6617318.

## INTRODUCTION

At a time of growing concern about corporate consolidation and monopolization in America, this appeal addresses whether a plaintiff challenging monopolistic conduct following an acquisition must show that the alleged monopolist possessed specific anticompetitive intent at the time of the acquisition. Over a century of Supreme Court authority says no: plaintiffs asserting claims of unlawful monopolization need only show the defendant's general intent to engage in the monopolistic conduct itself. Despite this well-understood principle of antitrust jurisprudence, the lower court came to the opposite conclusion.

CareFirst asserted Section 2 claims against J&J for its unlawful monopolization of the market for its blockbuster biologic medication Stelara (ustekinumab) and its would-be biosimilar competing medications by, among other things, acquiring a company called Momenta. Momenta owned patents covering methods of making biosimilar versions of biologic drugs, but J&J was not a biosimilar manufacturer and thus had "no procompetitive use" for the patents. J&J then used those patents to block and delay biosimilar manufacturers from selling competing biosimilar versions of Stelara. Op. & Order at 2-

7, *Carefirst of Maryland, Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288 (E.D. Va. 2024) (Dkt. No. 794).

The lower court denied J&J's motion to dismiss, concluding that monopolization by patent acquisition was sufficiently pleaded by allegations that "first, defendants are monopolists; second, defendants acquired exclusive rights in four patents covering some of the processes used to make biosimilars; third, defendants are not biosimilar producers; and fourth, defendants asserted the acquired patents in subsequent litigation." *CareFirst of Maryland, Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 303, 316 (E.D. Va. 2024). In other words, the court required no showing of a specific intent to monopolize the ustekinumab market was necessary to satisfy the elements of CareFirst's claims.

At summary judgment, however, the court reversed course and faulted CareFirst for not offering evidence that "at the time it acquired Momenta, J&J" had the specific intent "to use the Momenta manufacturing patents to exclude rivals on some basis other than efficiency."[4] Op. & Order at 20, *CareFirst of Maryland, Inc. v. Johnson &*

---

[4] Relying on an erroneous reading of *2311 Racing LLC v. NASCAR, LLC*, 139 F.4th 404 (4th Cir. 2025), the lower court initially concluded that CareFirst had presented sufficient evidence of J&J's specific intent, Opinion & Order 44-45, Dkt. No. 794, but reversed course after J&J asked the court to reconsider its reliance on privilege

*Johnson*, 745 F. Supp. 3d 288 (E.D. Va. 2024) (Dkt. No. 887); Op. & Order 42, Dkt. No. 794. The court expressly acknowledged that this conclusion was "inconsistent with Supreme Court precedent" and that subjective intent was not determinative of CareFirst's claims of unlawful monopolization. Op. & Order 40-41 n.19, Dkt. No. 794.

Over one hundred years of Supreme Court precedent establishes that completed (as opposed to attempted) monopolization only requires a general intent to engage in the challenged conduct, not a specific intent to exclude rivals. This Circuit has faithfully applied that uniform precedent. This well-established general intent standard preserves Section 2's structure and focus on exclusionary conduct and its anticompetitive effect because the anticompetitive harm wrought by a monopolist's exclusionary conduct is the same regardless of whether that monopolist had a subjective anticompetitive intent. Additionally, the district court's decision imposes substantial, if not insurmountable, evidentiary hurdles for private parties injured by unlawful monopolization that will stymie private enforcement of antitrust laws.

---

log evidence CareFirst used to show J&J's specific intent was improper. The Court granted J&J's summary judgment motion on CareFirst's claim for unlawful monopolization. Op. & Order 15-20, Dkt. No. 887.

The district court fundamentally misread this Court's decision in *2311 Racing LLC v. NASCAR, LLC*, 139 F.4th 404 (4th Cir. 2025). Rather than overturning more than ten decades of antitrust jurisprudence, *2311 Racing* affirmed the long line of cases holding that the intent requirement to establish unlawful monopolization "is subsumed in an analysis of the exclusionary conduct." *Drinkwine v. Federated Pubs., Inc.*, 780 F.2d 735, 739 (9th Cir. 1985).

The district court's decision to abandon general intent to prove unlawful monopolization is impossible to square with the black-letter jurisprudence from the Supreme Court, this Circuit, and circuit courts from across the country. As the Supreme Court recognized years ago: "Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (quoting Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 160 (1978)). If left to stand, this decision threatens to erode Section 2 and will have deleterious effects on the preservation of economic freedom and negatively impact American businesses and consumers alike. The decision below should be reversed and remanded.

## ARGUMENT

### I. Decades of Supreme Court Precedent Establishes That Monopolization Only Requires General Intent.

Sherman Act section 2 prohibits monopolization, which is defined as the "willful acquisition or maintenance" of monopoly power in a relevant market through exclusionary conduct rather than by superior skill, foresight, or business acumen. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 122 F.4th 120, 122 (4th Cir. 2024). Uninterrupted Supreme Court precedent spanning more than a century holds that completed monopolization, as opposed to claims of attempted monopolization, requires proof of only general intent—the intent to engage in the exclusionary conduct itself—to establish the "willful" acquisition or maintenance of monopoly power.

In its 1911 *Standard Oil Co. v. United States* decision, the Supreme Court held that the defendant's many acquisitions by themselves gave rise "to the prima facie presumption of intent and purpose to maintain the dominancy over the oil industry . . . [and] this prima facie presumption of intent to restrain trade, to monopolize and to bring about monopolization . . . *is made conclusive by considering . . . conduct.*" 221

U.S. 1, 75 (1911) (emphasis added). The Court has since reaffirmed the general intent standard for claims of unlawful monopolization. *See United States v. Griffith*, 334 U.S. 100, 105 (1948) ("[i]t is . . . not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated" because "[i]t is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements."), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *Times-Picayune Pub. Co. v. United States*, 345 U.S. at 626 (confirming that unlawful monopolization "demands only a general intent to do the act"). In *United States v. Aluminum Co. of America* ("*Alcoa*"), Judge Learned Hand explained why: to read Section 2's requirement that "the monopolist must have both the power to monopolize, and the intent to monopolize" as "demanding any 'specific,' intent, makes nonsense of it, *for no monopolist monopolizes unconscious of what [they are] doing*." 148 F.2d 416, 432 (2d Cir. 1945) (emphasis added). The Supreme Court later repeatedly endorsed *Alcoa*'s reasoning. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 814 (1946); *Times-*

*Picayune*, 345 U.S. at 626 (affirming general intent requirement because "no monopolist monopolizes unconscious of what he is doing.").

This doctrinal framework—that unlawful monopolization requires only general intent—reflects the fundamental distinction between attempted and completed monopolization. Attempted monopolization, by its nature, requires specific intent because the defendant has not yet achieved monopoly power. *Griffith*, 334 U.S. at 105 ("Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by [Section 2]."). "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent . . . an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen." *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905) (cleaned up). A specific intent to monopolize is what distinguishes the attempt to monopolize from lawful competitive conduct. *Times-Picayune*, 345 U.S. at 626; *Abcor Corp. v. AM Intern., Inc.*, 916 F.2d 924, 927 (4th Cir. 1990) (to establish specific intent "[t]he plaintiff must show that the defendant *sought to create* a monopoly by circumventing the competitive process." (emphasis added)). Otherwise, all competitive conduct could be characterized as attempted

monopolization because every "competitively energetic firm 'intends' to prevail over its actual or potential rivals," regardless of whether the firm aspires to monopoly power. Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 651c.1 (4th ed. 2024); *see also id.* ¶ 805b.1 ("[T]here is at least one kind of intent that the proscribed 'specific intent' clearly cannot include: the mere intention to prevail over one's rivals. . . .").

Completed monopolization, by contrast, involves a defendant that already possesses monopoly power. So, the focus is on whether the defendant's conduct maintains or extends that power through exclusionary means. *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 423 (10th Cir. 1952) ("As to the intent or the purpose of monopolies . . . [i]t is sufficient to satisfy this requirement if the consequence of a defendant's conduct or business arrangements results in a monopoly."). The defendant need not have harbored a subjective desire to monopolize or to exclude rivals; rather, it need only have intended to perform the acts constituting the exclusionary conduct. *Times-Picayune Pub.*, 345 U.S. at 626. The Supreme Court affirmed this distinction in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, where it recognized that intent is relevant

to characterize the nature of the defendant's conduct but clarified that specific intent beyond the intent to perform the act itself is required only for attempted monopolization. 472 U.S. 585, 602–03 (1985).

This fundamental distinction between general intent for monopolization and specific intent for attempted monopolization has been a cornerstone of antitrust jurisprudence. Indeed, this Circuit, like courts across the country, *infra* Arg. § III, has explicitly adopted the Supreme Court's distinction between the level of intent required to establish unlawful monopolization and attempted monopolization. In *Greenville Publishing Co. v. Daily Reflector, Inc.*, this Court explained that the defendant's below-cost pricing could be evidence "of either the specific intent required to prove an illegal attempt to monopolize or *the general intent* which, accompanied by monopoly power, *constitutes the offense of monopolization.*" 496 F.2d 391, 396 (4th Cir. 1974) (emphasis added); *accord Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) (confirming specific intent is required only for attempted monopolization); *Abcor Corp.*, 916 F.2d at 927 ("[A]ttempted monopolization requires a specific intent to destroy competition or build monopoly."); *E. I. du Pont de Nemours & Co. v. Kolon*

11

*Indus.*, 637 F.3d 435, 453 (4th Cir. 2011) (attempted monopolization requires specific intent to monopolize).

## II. Section 2 Is Structured Around Exclusionary Conduct and General Intent Serves That Structural Purpose.

Monopoly power itself is lawful. *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). So, "the nature and consequences of a particular practice are the vital consideration, not the purpose or intent." Areeda & Hovenkamp, ¶ 651c.1. As the Supreme Court declared: "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Trinko*, 540 U.S. at 407 (emphasis in original).

The general intent standard adheres to this focus on conduct rather than subjective intent. The foreclosing effect and competitive harm of a monopolist's exclusionary conduct is the same regardless of whether that monopolist had a premeditated anticompetitive plan. Areeda & Hovenkamp ¶ 1506 ("A merger threatening a substantial lessening of competition will be prevented no matter how innocent or procompetitive the parties' intentions. . . . When the evidence permits us to conclude that a joint venture is, on balance, substantially anticompetitive, we will

enjoin it even though the collaborators themselves sincerely believe otherwise."). Thus, while intent must exist, it "is subsumed in an analysis of the exclusionary conduct." *Drinkwine*, 780 F.2d at 739; *Microsoft*, 253 F.3d at 59 ("[I]n considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of [section 2] our focus is upon the effect of that conduct, not upon the intent behind it."); *McWane*, 783 F.3d at 840 ("For a monopolization charge, intent is 'relevant to the question whether the challenged conduct is fairly characterized as exclusionary or anticompetitive.'" (quoting *Aspen Skiing*, 472 U.S. at 602)); *FTC v. Meta Platforms*, 775 F. Supp. 3d 16, 54 (whether phrased as "willful acquisition" or "conduct with anticompetitive effects" either "teach the same lesson . . . plaintiffs must show that the action in question maintained a monopoly other than through 'competition on the merits.'"); *cf. United States v. Google LLC*, 778 F. Supp. 3d 797, 857 (E.D. Va. 2025) ("[W]hether a monopolist's conduct "harm[ed] the competitive *process* and thereby harm[ed] consumers" is thus the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated Section 2 of the Sherman

Act.") (quoting *Duke Energy*, 111 F.4th at 355) (emphasis in original). And this makes perfect sense because "no monopolist monopolizes unconscious of what [they are] doing." *Alcoa*, 148 F.2d at 432.

For this reason, anticompetitive intent may be helpful in understanding "the likely effect of the monopolist's conduct." *Microsoft*, 253 F.3d at 59; *see also Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1573 (11th Cir. 1983) ("knowledge of intent may help the court to interpret facts and to predict consequences") (quoting *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918)). But anticompetitive intent is not determinative of whether a defendant is an unlawful monopolist[5] because "[a]nticompetitive intent alone, no matter how virulent, is insufficient to give rise to an antitrust violation." *McWane*, 783 F.3d at 814; *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *United States v. Google LLC*,

---

[5] Indeed, the district court itself recognized this very principle. Op. & Order 41 n.19 Dkt. No. 794 (specific and subjective anticompetitive intent "is helpful but not determinative of whether J&J's acquisition of the Momenta patents was anticompetitive.").

747 F. Supp. 3d 1, 186 (D.D.C. 2024) ("A finding of anticompetitive intent is not an element of a Section 2 violation.").

### III. Requiring Specific Intent Would Hinder Private Enforcement by Causing Evidentiary Barriers to Unlawful Monopolization Claims.

The Supreme Court has long recognized that private antitrust enforcement serves two critical purposes: "to deter violators and deprive them of 'the fruits of their illegality,' and 'to compensate victims of antitrust violations for their injuries.'" *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978) (citations omitted); *accord Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (stating that the "lack of restrictive language [in the Clayton Act] reflects Congress' 'expansive remedial purpose' in enacting § 4"); *Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 572, 575–76 (1982). Private enforcement is essential to protecting competition: it "supplement[s] . . . the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979). The scheme envisioned by Congress, under which private litigants share responsibility for combating anticompetitive conduct, is significantly hampered where, as here, the lower court imposes higher evidentiary burdens to prove unlawful monopolization.

Under the district court's holding, a monopolist could acquire or maintain monopoly power through conduct that forecloses competition and harms consumers yet escape liability by claiming that the conduct was motivated by legitimate business reasons or that the anticompetitive effect was merely incidental to other objectives. But "good intention will [not] save an otherwise objectionable regulation," *Graphic Prods.*, 717 F.2d at 1573 (quoting *Bd. of Trade of Chi.*, 246 U.S. at 238), because a monopolist's ability to acquire and later weaponize its monopoly power is not diminished by the lack of specific intent. *Cf. Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition.").

Here, J&J acquired Momenta and its patented methods of making biosimilar drugs despite not being itself a biosimilar manufacturer, and then used the acquired Momenta patents to thwart companies that *do* make biosimilars from competing with Stelara. Op. & Order 2-7, Dkt. No. 794. The exclusionary effect of this conduct—delaying biosimilar entry and maintaining J&J's monopoly power—was the same regardless of J&J's subjective state of mind at the time of acquisition precisely because

J&J was a pre-existing monopolist. *Aspen Skiing*, 472 U.S. at 603 ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.") (quoting Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 160 (1978)).

Requiring specific intent for unlawful monopolization also presents extraordinary evidentiary hurdles to effective antitrust prosecution. *See Greenville Pub.*, 496 F.2d at 398 ("Antitrust plaintiffs seldom have access to admissions of guilt and are often forced to rely on inferences arising from conduct."). The intent inquiry "often seems to invite the parties to examine thousands of documents, to depose nearly everyone, to resist early disposition on the ground that disputed intent requires trial, to burden the judge and jury with ambiguous evidence, and to invite decision on the basis of relative purity of heart rather than competitive impact." Areeda & Hovenkamp ¶ 1506. Monopolists rarely, if ever, admit to anticompetitive motives in contemporaneous documents but instead strategically characterize actions in neutral or procompetitive terms. *See, e.g., Meta Platforms*, 775 F. Supp. 3d at 63 (recounting Meta's argument that, after acquiring Instagram, it "poured billions into developing and growing Instagram, adding 'dozens of new features' and providing

17

'hundreds of billions of dollars of consumer surplus' that could not have been achieved absent Meta's acquisition (internal citations omitted)).

And when there *is* written proof of an anticompetitive intent, it is often hidden in veiled references on privilege logs, as this case aptly demonstrates. The district court initially found genuine disputes of material fact regarding J&J's knowledge of the Momenta patents based on privilege log entries and document metadata. Op. & Order 44-45, Dkt. No. 794. However, on reconsideration, the court granted summary judgment after concluding that reliance on privilege log entries to establish J&J's knowledge would require impermissible negative inferences about privileged communications. Op. & Order 15-20, Dkt. No. 887. In this way, the specific intent requirement imposed by the district court, if not reversed, can effectively immunize monopolists from antitrust liability for anticompetitive conduct: a monopolist could acquire assets, assert privilege over its internal deliberations as to what exclusionary objectives it can accomplish with those assets, and then claim that the plaintiff cannot prove subjective anticompetitive purpose.

The general intent standard that applies to unlawful monopolization—the intent to engage in the exclusionary conduct itself—

better aligns with the rule-of-reason tradition of Section 2 and the statute's broad remedial and deterrence purposes. This long-settled approach preserves the role of intent simply as a tool for understanding conduct, prevents intent from becoming an impassable gatekeeping requirement that forecloses otherwise meritorious claims, and ensures the efficient enforcement of our antitrust laws.

## IV. The District Court's Decision to Impose a Specific Intent Requirement Misreads This Court's Opinion in *2311 Racing*.

Contrary to the district court's reading, *see* Opinion & Order 40-41 n.19, Dkt. No. 794, *2311 Racing* did not overturn decades of authority from this Circuit and the Supreme Court by holding that unlawful monopoly requires specific intent. Far from it. *2311 Racing* stands for the well-understood legal principle that intent for the purpose of unlawful monopolization can be properly understood as being incorporated into the analysis of exclusionary or anticompetitive conduct. 139 F.4th at 410.

The district court suggested that *2311 Racing* imposes a specific-intent requirement by holding that, for the purposes of unlawful monopolization, willfulness is satisfied where the defendant "intended to exclude rivals on some basis other than efficiency." Op. & Order 40-41, Dkt. No. 794. But this language was merely this Court's recitation of the

conduct element of an unlawful monopolization claim, as it quoted *Aspen Skiing* (which itself emphasized the difference between general intent for monopolization and specific intent for attempted monopolization). 139 F.4th at 410. This interpretation of *2311 Racing* is reinforced by this Court's opinion that the plaintiffs in that case were unlikely to succeed on the conduct element not because of a failure to show specific intent but a failure to demonstrate anticompetitive conduct:

> Neither the plaintiffs nor the district court has shown how the release would have injured *competition.* And absent anticompetitive conduct in the service of monopoly power, the law recognizes that parties are "free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."

*Id.* (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)) (emphasis added). *2311 Racing*'s inclusion of the words "conduct intended to" before the words "exclude rivals," 139 F.4th at 410, was not intended to depart from well-settled antitrust law by imposing a new specific intent requirement to unlawful monopolization. Indeed, the district court understood that reading *2311 Racing* as it did was inconsistent with the precedent explained above. Op. & Order 40 n.19, Dkt. No. 794 ("The Fourth Circuit's most recent articulation of the

monopolization standard is also inconsistent with Supreme Court precedent.").

*2311 Racing* imposed no specific intent requirement for unlawful monopolization.[6] The law of this Circuit has been, and remains, that unlawful monopolization simply requires general intent to engage in exclusionary conduct. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 315 (4th Cir. 2007) (a "firm violates [section 2] when it acquires or maintains . . . a monopoly by engaging in exclusionary conduct"). The district court simply got *2311 Racing* wrong.

## CONCLUSION

The lower court's decision threatens to shift the behavior requirement out of unlawful monopolization and convert the long-established exclusionary-conduct framework into a state-of-mind inquiry. Such an outcome contravenes decades of Supreme Court

---

[6] *2311 Racing*, in any event, cannot override binding Supreme Court precedent. *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) ("[V]ertical *stare decisis* is absolute . . . other federal courts have a constitutional obligation to follow a precedent of [the Supreme Court] unless and until it is overruled by [the Supreme Court]." (quoting U.S. Const., Art. III, §1)). So, even if *2311 Racing* could be read to interpose a specific intent requirement on unlawful monopolization, vertical *stare decisis* prevented the district court from departing from the near eight decades of Supreme Court precedent holding unlawful monopolization only requires general intent. *Supra* Arg. § 1.

precedent and the case law of this Circuit while also inviting monopolists to weaponize exclusionary conduct under the guise of their subjective intent. The district court's decision should be reversed.

Date: June 22, 2026

Respectfully Submitted,

*s/David M. Cialkowski*_____
Zachary J. Freese
David M. Cialkowski
ZIMMEREMAN RED
1100 IDS Centr
80 South 8th Street
Minneapolis, MN 55402
800-755-0098
*Zachary.Freese@zimmreed.com*
*David.Cialkowski@zimmreed.com*
*Counsel for Amicus Curiae Committee to Support the Antitrust Laws*

Geoffrey H. Kozen
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
(612) 349-8500
GKozen@RobinsKaplan.com
*Co-Chair, COSAL Amicus Committee*

Kristie A. LaSalle
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S. #2200
Minneapolis MN 55401
(612) 339-6900
*KALaSalle@Locklaw.com*
*Co-Chair, COSAL Amicus Committee*

Deborah A. Elman
Garwin Gerstein & Fisher LLP
88 Pine Street
28th Floor
New York, NY 10005
(212) 398-0055
DElman@GarwinGerstein.com
*President, Committee to Support
Antitrust Laws*

23

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. 32(a)(7) because, excluding the parts of the documents exempted by Fed. R. App P. 32(f), it contains 4,203 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Times New Roman.

On June 22, 2026, pursuant to LR 25.1, I caused the foregoing brief to be served upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

This file was scanned with Windows Defender, version 1.421.371.0, and no virus was detected.

Date: June 22, 2026          Respectfully Submitted,

_s/David M. Cialkowski_
David M. Cialkowski