# In the
# United States Court of Appeals
# for the Fourth Circuit

CAREFIRST OF MARYLAND, INC.; GROUP HOSPITALIZATION & MEDICAL
SERVICES, INC.; CAREFIRST BLUECHOICE, INC.,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants,*

*v.*

JOHNSON & JOHNSON; JANSSEN BIOTECH, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 23-cv-629 (The Hon. Jamar K. Walker)

**BRIEF OF THE AMERICAN ANTITRUST INSTITUTE
AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND REVERSAL**

KATHLEEN BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Ave., NW
Washington, DC 20036
(202)304-0195
kbradish@antitrustinstitute.org

*Counsel for Amicus Curiae*

June 22, 2026

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, amicus curiae the American Antitrust Institute states that it is a nonprofit, non-stock corporation organized under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Table of Authorities .............................................................................. iii

Interest of Amicus Curiae....................................................................... 1

Introduction and Summary of Argument ............................................. 2

Argument................................................................................................ 5

   I.  The Test for Section 2 Liability Is Effects-Based, Not Intent-Based. ................................................................................................ 5

      A. The Supreme Court Imposes No Specific-Intent Test for Completed Monopolization. ...................................................... 8

      B. The "Mere Intent" Standard Is No More Than a Simple Conduct Requirement. ......................................................... 10

      C. Anticompetitive Intent Is Probative of Effects, Not an Element of the Claim. ..................................................................... 14

      D. Recent Fourth Circuit Caselaw Does Not Deviate from These Long-Held Principles. ......................................................... 18

      E. Contrasting the Civil Monopolization Offense with the Attempt and Criminal Offenses Confirms that It Has No Independent Intent Element. ................................................................. 24

   II. Good Antitrust Policy Requires an Effects-Based, Not an Intent-Based, Test for Monopolization Claims. ................................... 27

      A. Section 2 Protects Consumer Welfare, and an Effects Test Measures It Most Directly. ............................................... 28

      B. An Intent Requirement Is Not Fit for Purpose. ................... 30

      C. An Intent Requirement Is Counterproductive Because Intent Evidence Can Be Manufactured and Suppressed. ............... 30

Conclusion .......................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC,*
139 F.4th 404 (4th Cir. 2025) ...............................................*passim*

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) ...............................................*passim*

*Bd. of Trade of City of Chi. v. United States,*
246 U.S. 231 (1918) ............................................... 14

*Cascade Health Sols. v. PeaceHealth,* 515 F.3d 883
(9th Cir. 2008) ............................................... 10

*Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752 (1984).............. 7

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.,* 679 F.2d 516
(5th Cir. 1982) ............................................... 10

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
111 F.4th 337 (4th Cir. 2024) ...............................................*passim*

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) ....................................... 6,7,11,20

*In re Lipitor Antitrust Litig.,* 868 F.3d 231
(3d Cir. 2017) ............................................... 9

*Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.,* 748 F.3d 160
(4th Cir. 2014)……………………………………………………6

*Reiter v. Sonotone Corp.,* 442 U.S. 330 (1979) ................................. 27

*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447 (1993) .........*passim*

*Times-Picayune Pub. Co. v. United States,* 345 U.S. 594 (1953) ........ 8

*United States v. Aluminum Co. of Am. (Alcoa)*, 148 F.2d 416
 (2d Cir. 1945)................................................................*passim*

*United States v. Griffith*, 334 U.S. 100 (1948).............................. 6,8,11

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) .................*passim*

*United States v. Gypsum Co.*, 438 U.S. 422 (1978) .......................... 25

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ...... 6,10

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) ......... 9

*United States v. Swift & Co.,* 286 U.S. 106 (1932)……………………..12

*United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295
 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954) ................................ 9

*United Food & Com. Workers Local 1776 v. Takeda Pharm. Co.*,
 11 F.4th 118 (2d Cir. 2021)........................................................ 9

**Statutes**

15 U.S.C. § 2 ................................................................................*passim*

**Other Authorities**

Adrianne Jeffries, *To Head Off Regulators, Google Makes Certain Words
 Taboo*, The Markup (Aug. 7, 2020), https://themarkup.org/google-
 the-giant/2020/08/07/google-documents-show-taboo-words-
 antitrust.................................................................................30

Herbert Hovenkamp, *The Monopolization Offense,*
 61 OHIO ST. L.J. 1035 (2000)......................................... 10,17,29

Steven C. Salop, *Exclusionary Conduct, Effect on Consumers, and the
 Flawed Profit-Sacrifice Standard,*
 73 ANTITRUST L.J. 311 (2006) .................................................. 28

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (4th ed. 2015) ........................................................................................ 21

**INTEREST OF AMICUS CURIAE**[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders.[2]

AAI has a particular interest in the sound development of Section 2 doctrine, which is central to preserving competition in concentrated markets, including markets for pharmaceutical products. AAI submits this brief to address the legal standard governing the conduct element of

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than amicus and its counsel made a monetary contribution intended to fund its preparation or submission. All parties have consented to the filing of this brief.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions. Certain members of AAI's Board of Directors or Advisory Board, or their law firms, represent Plaintiffs-Appellants, but they played no role in AAI's deliberations with respect to the filing of the brief.

a completed monopolization claim and the consequences of the district court's departure from that standard.

## INTRODUCTION AND SUMMARY OF ARGUMENT

A dangerous legal error lies at the heart of the district court's order granting summary judgment below. Uncorrected, it offers monopolists an easy loophole to avoid liability for anticompetitive conduct. To test liability under Section 2 of the Sherman Act, the district court asked "whether the defendant 'intended to exclude rivals on some basis other than efficiency.'" JA_[ECF.794.at.40] (quoting *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 410 (4th Cir. 2025)). Treating that phrase as a freestanding intent element of a Section 2 offense, the court asked whether CareFirst could prove J&J's subjective purpose at the moment in time when it acquired the Momenta patents, and granted summary judgment when it concluded that "[a] reasonable inference of actual knowledge does not alone give rise to a reasonable inference of intent to exclude rivals anticompetitively." JA_[ECF.887.at.18]. The district court erred.

The test for completed monopolization is effects-based, not intent-based. The standard for civil liability has always focused on how a

defendant's conduct affects competition, not on the intentions behind it. The *2311 Racing* phrase the district court elevated into a test is, properly read, a shorthand description of exclusionary conduct: conduct that excludes rivals on some basis other than efficiency. It is not a command to prove the defendant's state of mind. Intent-focused inquiries are reserved for attempted monopolization and criminal offenses, where effects cannot yet, or do not alone, determine liability. The Supreme Court has not wavered on this distinction, and recent Fourth Circuit precedent, in particular *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), confirms it.

The district court's error matters because its intent test asks the wrong question about the wrong conduct. The correct inquiry is whether J&J's acquisition and subsequent assertion of the Momenta patents, viewed as a whole, foreclosed biosimilar competition against Stelara without a procompetitive justification. *Duke Energy* requires analyzing course-of-conduct claims holistically and forbids parsing an allegedly anticompetitive scheme into individually innocuous acts. By demanding instead that CareFirst prove a discrete anticompetitive intent element at the single instant of the patent acquisition, the district court isolated

one act from the course of conduct of which it was an alleged part, and it made the defendant's state of mind dispositive of a claim that the law evaluates based on its effects.

Section I explains that the test for completed monopolization is, and always has been, effects-based. The Supreme Court has held repeatedly that specific intent is not an element of the completed offense; the "willful" language in *Grinnell* requires only the general intent to engage in the challenged conduct. Evidence of anticompetitive intent is relevant, but only to help characterize ambiguous conduct. Intent is not a threshold element that the plaintiff must satisfy to prove liability. Recent Fourth Circuit authority, in particular *Duke Energy*, decides completed monopolization claims by effect, views the challenged conduct as a whole, and treats intent as a bolster, not a burden. The contrast with attempted monopolization and criminal Section 2 offenses, both of which do require proof of intent, confirms the point: the law demands a state-of-mind showing only where effects cannot supply one or *mens rea* it is generally required.

Section II explains that sound antitrust policy compels the same conclusion. Section 2 protects consumer welfare, and the effects-based

test is designed to measure the impact on welfare directly. A freestanding intent requirement asks the wrong question, and it is worse than merely imprecise: it offers effective immunity for anticompetitive conduct that harms consumers. Because anticompetitive intent is proved largely through a defendant's own documents, sophisticated firms can escape liability and avoid victim redress simply by scrubbing the documentary record.

## ARGUMENT

### I. The Test for Section 2 Liability Is Effects-Based, Not Intent-Based.

The district court here made a clear and dangerous error by appending a specific-intent requirement to Section 2's monopolization test. The civil liability standard for completed monopolization has always been effects-based, focused squarely on how anticompetitive conduct affects competition, not on the intentions of the monopolist. An inquiry into intent is reserved for claims of attempted monopolization and criminal liability. The Supreme Court has not wavered on the distinction, and recent Fourth Circuit precedent only clarifies it.

In 1966, the Supreme Court in *United States v. Grinnell* articulated the two-part test that is the unchallenged standard for Section 2 liability: "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 384 U.S. 563, 570–71. The test has been universally adopted, including in the Fourth Circuit. *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014).

At issue here is the second element of the *Grinnell* test. It has been long understood as an exclusionary-conduct requirement. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (The second element is satisfied by "the use of monopoly power... to foreclose competition, to gain a competitive advantage, or to destroy a competitor."); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (a plaintiff must demonstrate that the monopolist's conduct was "exclusionary" or "anticompetitive," meaning it must establish that conduct harms the competitive process). As the Supreme Court explained in *United States v. Griffith*, it is a line-

drawing exercise that seeks to distinguish conduct that "foreclosed competition" from conduct that was the inevitable consequence of normal competitive development. 334 U.S. 100, 107 (1948) (differentiating a theatre owner's legal, large-scale buying from its use of that practice to expand its monopoly), *abrogated on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). In *Grinnell,* the Court held that a course of conduct including competitor acquisitions, exclusionary long-term contracts, and blocking rivals' access to necessary technology was on the illegal side of the line. 384 U.S. at 572–76. On the other, legal side lay the "as distinguished from" list—superior product, business acumen, or historic accident.

How to draw the line between legal and illegal conduct under Section 2 has not always been clear in practice and, as the Supreme Court has recognized, often requires deep factual investigation. *See, e.g., Eastman Kodak,* 504 U.S. at 466–67 (antitrust claims are to be decided "on a case-by-case basis, focusing on the particular facts disclosed by the record."). What is clear is that the Court's use of the word "willful" has nothing to do with specific intent. Developing a superior product is no less intentional than inking illegal exclusionary

contracts like those at issue in *Grinnell*, nor is exercising business acumen, which usually requires significantly more willfulness than blocking a rival's access to technology. And inventors of superior products have the same intent—and may achieve the same market dominance as a result—as the business owner who chokes off rivals' input supply. The difference between legal and illegal conduct under the Sherman Act thus is the means of executing on that intent, not the intent itself.

A. **The Supreme Court Imposes No Specific-Intent Test for Completed Monopolization.**

The Supreme Court has repeatedly clarified that there is no specific-intent test for completed monopolization claims. *See, e.g.*, *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953) (holding that "the completed offense of monopolization under § 2 demands only a general intent to do the act, for no monopolist monopolizes unconscious of what he is doing"). In *United States v. Griffith*, the Court held that "it is not always necessary to find a specific intent to restrain trade or to build a monopoly" to establish a Section 2 violation. 334 U.S. at 105. It is enough, the Court explained, "that a

restraint of trade or monopoly results as the consequence of a defendant's conduct." *Id.* The same term, the Court repeated the point without qualification: "specific intent is not necessary to establish a 'purpose and intent'" to monopolize. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 173 (1948). And the canonical articulation of the point originated with Judge Wyzanski, affirmed by the Court per curiam, who stated that a monopolist who has "willed the means, has willed the end," such that no separate inquiry into anticompetitive purpose is required once exclusionary conduct is shown. *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295, 346 (D. Mass. 1953), *aff'd*, 347 U.S. 521 (1954) (per curiam).

An unbroken line of circuit court precedent holds the same. The Second Circuit has confirmed that the only intent a monopolization claim requires is the "mere intent to do the act," that is, a general intent, not a specific purpose to exclude. *United Food & Com. Workers Local 1776 v. Takeda Pharm. Co.*, 11 F.4th 118, 137 (2d Cir. 2021) (quoting *United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir. 1945)). The Third Circuit has held unambiguously that specific intent "is not an element" of a monopolization claim. *In re Lipitor*

*Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017). The en banc D.C. Circuit, in its foundational *Microsoft* decision, wrote: "Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct." *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc). The Fifth and Ninth Circuits agree. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 n.3 (9th Cir. 2008); *Dimmitt Agri Industries, Inc. v. CPC International Inc.*, 679 F.2d 516, 531–32 (5th Cir. 1982).

## B.     The "Mere Intent" Standard Is No More than a Simple Conduct Requirement.

Despite enduring and widespread acceptance of this point, a small handful of courts and commentators have occasionally misread the term "willful" in the *Grinnell* test. Standing alone, the term is, Herbert Hovenkamp has explained, "at best not helpful, and at worst misleading." Herbert Hovenkamp, *The Monopolization Offense*, 61 OHIO ST. L.J. 1035, 1038 (2000). On closer inspection, even those courts have done nothing more than infer "intent" from the real focus of their analysis—the challenged conduct's effects.

Helpfully explicit on this point is Judge Learned Hand's opinion in *Alcoa,* a foundational monopolization case widely cited by the Supreme Court. 148 F.2d 416 (2d Cir. 1945); *see also Griffith,* 334 U.S. at 105; *Grinnell Corp.,* 384 U.S. at 571; *Eastman Kodak,* 504 U.S. at 483. Expressly examining whether there is a threshold specific intent element to establish civil monopolization, Judge Hand begins by allowing the possibility that Alcoa, like Malvolio of *Twelfth Night*, "may not have achieved monopoly; monopoly may have been thrust upon it." *Alcoa*, 148 F.2d at 429. No advanced scholarship was needed to catch Judge Hand's doubts about self-proclaimed innocent monopolizers. And indeed, he struck a more serious note to emphasize that the range of cases is narrow in which a "passive beneficiary of monopoly" may lack the "mere intent" necessary to satisfy Section 2's conduct requirement. His examples of "monopolists by force of accident" provide the blueprint for *Grinnell*'s "as distinguished from" list: the purveyor whose rivals have been driven out of business by changes in taste or costs ("superior product"), the single producer who alone survives among a group of competitors merely by virtue of his superior skill, foresight and industry

11

("business acumen"), and the "natural" monopolist ("historic accident").

*Id.* at 429–30.

Judge Hand then considers the sometimes murky ways in which previous courts, usually in dicta, attempted to characterize the same concept, concluding that the most useful focus is on the statute's active verb, "monopolize." *Id.* Hand found this formulation grounded in the Supreme Court's distinction in *United States v. Swift & Co.*, 286 U.S. 106 (1932), between firms that merely possess monopoly power and those that "magnify" their monopoly, "utilizing" their size for abuse. *Id.* In the case of Alcoa, he concluded, there was ample evidence that the defendant used its size in ways that violated Section 2. In the face of such unlawful conduct, he explained, "we disregard any question of 'intent.'" *Id.* at 431. To require "specific" intent, he cautioned, would make "nonsense" of the monopolization standard, "for no monopolist monopolizes unconscious of what he is doing." *Id.* at 432. Insofar as Alcoa "meant to keep and did keep" its exclusive hold on the market, it had monopolized that market, "however innocently it otherwise proceeded." *Id.*

The same framework answers the recurring objection that a monopolist who acquired its position through a discrete, sometimes-lawful act—here, a corporate acquisition—should not be liable absent proof that it planned to exclude rivals from the outset. Judge Hand's "monopolists by force of accident" are a narrow class: the firm whose rivals fell away through shifts in taste or cost, that prevailed by skill alone, or that holds a natural monopoly. A firm that acquires and then asserts patents to foreclose competitors does not fit that class, because nothing about acquiring or enforcing a patent is so self-executing and inevitable that it can be said to lead to "involuntary elimination of competitors by automatically operative economic forces." *Id.* at 429. Where such conduct is alleged to have foreclosed competition, the *Alcoa* framework simply asks whether it did so—not whether the defendant can plausibly disavow, after the fact, the intent to bring about the result. A claim that a defendant acquired and asserted patents to exclude biosimilar rivals, as here, is therefore evaluated according to its effect on competition, viewed holistically as part of a challenged course of conduct, and not according to the defendant's state of mind at the moment of acquisition.

13

## C. Anticompetitive Intent Is Probative of Effects, Not an Element of the Claim.

The caselaw is clear that evidence of anticompetitive intent is relevant, but only as evidentiary support, not as a required element of a Section 2 claim. Indeed, many cases have found that intent evidence, when available, can be a powerful indication that otherwise ambiguous conduct is in fact anticompetitive. As Judge Brandeis explained in *Bd. of Trade of City of Chi. v. United States*, "the purpose or end sought to be attained … are all relevant facts." 246 U.S. 231, 238 (1918). But "not because a good intention will save an otherwise objectionable regulation or the reverse, but because knowledge of intent may help the court to interpret facts and to predict consequences." *Id.* The key, however, is that the intent is relevant in interpreting otherwise ambiguous conduct, where the exclusionary effect is not otherwise clear. Its presence does not transform lawful conduct into illegal conduct, and its absence does not render unlawful conduct legal.

This distinction is captured by the Supreme Court's logic in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). That case is worth examining closely, not least because an out-of-context

14

excerpt from the opinion seems to be at the root of the district court's misunderstanding. In wrongly adopting a specific intent element, the district court relied on a phrase from *2311 Racing* that cited to *Aspen* and described, as a shorthand for the requisite conduct inquiry articulated in *Aspen,* an inquiry into "whether the defendant 'intended to exclude rivals on some basis other than efficiency.'" JA_[ECF.794.at.40] (quoting *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 410 (4th Cir. 2025)). In the original phrase from *Aspen*, the Supreme Court described as predatory any conduct "attempting to exclude rivals on some basis other than efficiency." 472 U.S. at 605. The *Aspen* opinion includes an extended discussion directly addressing intent, but that phrase—relied upon in *2311 Racing*—is not excerpted from the intent discussion. Rather, it appears in a section discussing the importance of determining how the challenged conduct affects the consumer—that is, from the Court's holding that Section 2 is effects-based.

In its discussion directly addressing intent, which precedes its description of predatory conduct, the *Aspen* Court was quite clear in explaining how evidence of anticompetitive intent should be used. After

quoting Judge Hand's analysis of "mere intent" in *Alcoa*, the Court emphasized that, in a completed monopolization case, "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Id.* at 601.

In *Aspen*, the facially ambiguous conduct was a refusal to deal, with the dominant ski hill in Aspen, Colorado refusing to continue its all-mountain ticket deal with a smaller competitor, which had the effect of excluding that competitor from the market. *Id.* at 587–95. Absent other evidence, this could have been a legitimate business decision. For example, the smaller competitor could have been a source of overwhelming customer complaints that was causing the dominant supplier to lose money on the collaboration. But intent evidence helped show this was not the case. Together with evidence of prior conduct, and importantly, a lack of legitimate business justifications, intent evidence helped the Court conclude that Section 2 liability was warranted. *Id.* at 609.

The order of the Supreme Court's analysis is crucial: first it found that the refusal to deal excluded a rival and only then did it find that

the defendant did not offer a legitimate, efficiency-based business justification for the conduct. Intent evidence was relevant only because it further suggested that no such justification existed. As Professor Hovenkamp summarizes, the case shows that for completed monopolization claims, "the nature and consequences of a particular practice are the vital consideration, not the purpose or intent. Qualifying anticompetitive conduct must always be established first by objective facts about the relevant market and the defendant, quite apart from any manifestation of subjective intent." 61 OHIO ST. L.J. at 1039.

The district court here failed to follow the Supreme Court's prescription. Instead of taking the intent evidence as "merely relevant" to whether there was a legitimate business justification for Defendant's conduct, it made the manifestation of subjective intent into a threshold inquiry, exactly as Judge Hand cautioned would be "nonsense" long ago. *Alcoa*, 148 F.2d at 432. The district court did not ask whether J&J's acquisition and assertion of the Momenta patents foreclosed biosimilar competition without a procompetitive justification. It asked instead whether CareFirst could prove J&J's subjective purpose, holding that "[a] reasonable inference of actual knowledge does not alone give rise to

a reasonable inference of intent to exclude rivals anticompetitively," JA_[ECF.887.at.18], and it granted summary judgment because "no reasonable jury could infer J&J acquired Momenta with the intent to exclude rivals on some basis other than efficiency." *Id.* at 19. That approach inverts what *Aspen* prescribes: subjective intent became the element to be proved, rather than a means of characterizing conduct whose effects the court had already assessed. The district court's approach is fundamentally erroneous and, as discussed below in Section II, threatens to immunize a wide range of monopolistic conduct by subjecting it to easily manipulable standards.

### D. Recent Fourth Circuit Caselaw Does Not Deviate from These Long-Held Principles.

The district court's interpretation of Fourth Circuit caselaw on intent resembles the garbled message at the end of the schoolyard game of telephone. It seizes on a phrase in a recent case, *2311 Racing*, but it does not connect the dots back to the cited language's origins. As a result, what the district court takes from it may sound vaguely like the initial message but has little substantive connection to it.

In part, the district court misses the message because it starts in the wrong place. As plaintiffs-appellants have already noted, *2311 Racing* is not a case in which intent is even at issue. Opening Br. at 34. Instead, the focus was on whether a mutual release of antitrust claims can affect competition. The *2311 Racing* language the district court cites merely recites the Section 2 conduct element. The full context is fleshed out in a different case that uses precisely the same language, *Duke Energy*, 111 F.4th 337, which a panel of this Court decided less than a year earlier and in which a petition for en banc rehearing was denied. *Duke Energy* makes clear that this Court's exclusionary-conduct standard remains consistent with its earlier cases and the long tradition of Supreme Court precedent. Completed monopolization claims are a question of competitive effect. Evidence of anticompetitive intent plays only the supporting role that the *Aspen* court assigned to it. It is not an independent element plaintiffs must prove.

Unlike *2311 Racing*, *Duke Energy* involved an in-depth analysis of the exclusionary-conduct prong of the *Grinnell* test. As in *Grinnell*, this Court performed a line-drawing exercise, and the line was drawn based on effect, not intent. The Court made clear that a monopolist does not

violate Section 2 by offering a superior product, a better service, or a lower price, because such conduct "is procompetitive and thus increases consumer welfare." *Id.* at 353. A violation arises when the monopolist uses its power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* (quoting *Eastman Kodak* 504 U.S. at 482–83). On the lawful side of the line are actions that are consistent with consumer welfare and the competitive process. On the unlawful side are actions leading to foreclosure and exclusion that lack legitimate procompetitive justification. Intent is nowhere a decisive factor. And surely, if this Court had intended to depart from Supreme Court precedent, it would not have done so through an "i.e." and attributed its holding to the same Supreme Court case the district court reads it as deviating from.

The substance of the *Duke Energy* decision makes clear that there is no threshold "specific intent" inquiry in this Circuit. If there were, the decision could never have come out the way it did. The opinion rejects the approach of a district court which had analyzed the five alleged monopolistic actions in isolation and found each independently lawful. Instead of accepting the district court's reasoning that "[a]dding up

several instances of lawful conduct cannot total unlawful conduct"—

that "0 + 0 = 0"—this Court held that anticompetitive conduct "must

always be analyzed 'as a whole.'" *Id.* at 352. This is because, the Court

reasoned, "[a] monopolist bent on preserving its dominant position is

likely to engage in repeated and varied exclusionary practices," each of

which "viewed in isolation might be viewed as de minimis or an error in

judgment, but the pattern gives increased plausibility to the claim." *Id.*

at 355 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 310c7).

Such a holistic approach is only possible if the focus is on

cumulative effects, not intent. The exclusionary effect of a course of

conduct is often visible only in the aggregate—from the shape of a

scheme rather than in any single act. A court fixated on the actor's state

of mind, evaluating it act by act, would never see it.

An example from the case shows why. Duke held roughly ninety

percent of the wholesale power market in the Carolinas. *Id.* at 353.

When a more efficient entrant, NTE, began winning Duke's customers,

Duke devised what it called a "blend-and-extend" strategy: a large

retroactive discount on the years a key customer was already locked

into Duke, conditioned on a long-term renewal at rates higher than the

entrant would have charged. *Id.* at 356–59. Standing alone, a price cut could be competition at work. But the court looked at structure and effect rather than at price in isolation and saw an offer the entrant could not match—not because the entrant was less efficient, but because only the incumbent could discount the captive years. *Id.* at 357–62.

The court did not assess this conduct in the first instance by requiring proof of Duke's state of mind. It assessed the effect. Duke's own analysis showed the strategy would let it charge "higher prices than offered by the competition" once the discounted years expired, recovering through later monopoly rents what it gave away up front. *Id.* at 358. The effect of the discount was thus not competition on the merits but a toll even a more efficient rival could not pay. Whether the offer was lawful price competition or unlawful exclusion was a question the court answered by tracing consequences, not by demanding proof of purpose. Evidence of anticompetitive intent, while relevant, was just one of three categories of evidence that helped rule out legitimate business justifications—and even then not the first. *Id.* at 357–59. What

mattered as a matter of law was that there was sufficient evidence of its exclusionary effect to justify a trial.

Only after having already found the record sufficient on the effects of Duke's campaign did this Court note that NTE had also presented evidence that "Duke consciously sought to exclude NTE from the relevant market because it was a more efficient rival." *Id.* at 367. Duke's own employees had written that the company "need[ed] the NTE train to stop." *Id.* at 366. That evidence, the court said, "bolsters our conclusion that the case is trial worthy." *Id.* at 367. The key word is "bolsters." The intent evidence did not establish the violation. It did not supply a missing element. It confirmed a conclusion that the effects analysis had already revealed. That is precisely the role the Supreme Court assigned intent evidence to play in *Aspen*.

*Duke Energy* defines exclusionary conduct by reference to consumer welfare and the competitive process. It draws the line between lawful and unlawful conduct by effect. It requires the challenged conduct to be viewed as a whole. And it treats intent as a bolster and not a burden. In short, the opinion in *Duke Energy* forecloses the district court's claim of a change in Fourth Circuit law.

Had the district court applied the correct framework to J&J's acquisition and assertion of the Momenta patents as prescribed by *Duke Energy,* it would have asked whether the conduct, viewed as a whole, foreclosed biosimilar competition without a procompetitive justification. Instead it asked whether CareFirst could prove that J&J subjectively "intended to exclude rivals on some basis other than efficiency" at a single moment in time, and it granted summary judgment when the plaintiff's proof of that freestanding mental state fell short. *Duke Energy* requires a fundamentally different inquiry.

E.   **Contrasting the Civil Monopolization Offense with the Attempt and Criminal Offenses Confirms that It Has No Independent Intent Element.**

If any doubt remained that completed civil monopolization is an effects-based offense, it is dispelled by comparison with two related offenses that do require proof of intent. The law demands a state-of-mind showing in only those settings where effects cannot supply one or *mens rea* is generally required.

Attempted monopolization requires specific intent. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993). The reason is structural. An attempt claim reaches conduct before monopoly has been

24

achieved, when the anticompetitive effect lies in the future and may never arrive. The plaintiff must therefore show both a specific intent to monopolize and a dangerous probability that the attempt would succeed. *Id.* at 456. Intent does work in the attempt context that effects cannot yet do, because the harm the statute targets has not yet materialized. The Court in *Spectrum Sports* drew exactly this line, holding that the specific-intent requirement distinguishes attempt from completed monopolization and warning against doctrines that would collapse the two. *Id.* at 459. The completed offense needs no such requirement because, by definition, the conduct and its effects are already present to be examined.

Criminal Section 2 prosecutions require *mens rea* for another but equally distinctive reason: the general principles of criminal culpability. In *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978), the Court held that intent is an element of a criminal antitrust offense because it declined to read the Sherman Act as imposing criminal liability on a strict-liability basis. *Id.* at 435–43. The Court made plain that its imposition of the requirement flows from the general principles of criminal law, not from anything peculiar to monopolization. *Id.* at

436–38. It is a general requirement for criminal liability in many areas, layered on top of the civil conduct standard for antitrust liability rather than derived from it. The civil offense, which carries no criminal exposure, creates no such demand.

Completed civil monopolization claims rest on different grounds than attempted monopolization and carry different consequences than criminal antitrust claims, and their requirements reflect this. Unlike attempt, their effects have materialized and can be analyzed with the benefit of hindsight. Unlike a criminal prosecution, they impose no penal sanction that would implicate a *mens rea* requirement. Intent is therefore neither structurally necessary, as it is for attempt, nor doctrinally imported, as it is for crime. It retains only the evidentiary role *Aspen* described and *Duke Energy* performed: a means of characterizing ambiguous conduct, available to bolster a conclusion that effects analysis reaches on its own.

The district court's reading erases these distinctions. It required CareFirst to prove that J&J *intended* to exclude rivals at the specific moment it acquired the Momenta patents, rather than asking whether J&J's acquisition and subsequent assertion of those patents, viewed as

26

a whole, foreclosed biosimilar competition without a procompetitive justification. By fixing on J&J's state of mind at the instant of acquisition, the court parsed into isolated acts a course of conduct that *Duke Energy* required it to assess together—and in doing so grafted onto a completed civil claim the specific-intent showing that *Spectrum Sports* reserved for attempt. It demanded of the civil plaintiff what the law demands only where effects are absent or where criminal penalties are at stake. Neither condition is present here.

## II. Good Antitrust Policy Requires an Effects-Based, Not an Intent-Based, Test for Monopolization Claims.

Fundamental principles of effective antitrust policy compel as clear a conclusion as the caselaw. The purpose of Section 2 is to protect consumers and other victims of unlawful conduct. An intent requirement does not serve that purpose, and worse, it invites evasion by the sophisticated defendants most able to inflict consumer harm.

### A. Section 2 Protects Consumer Welfare, and an Effects Test Measures It Most Directly.

The Supreme Court has called the antitrust laws a "consumer welfare prescription." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979). Section 2 exists to safeguard the competitive process "ultimately

for the benefit of consumers," not to protect competitors from rivalry. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *see Duke Energy*, 111 F.4th at 353. The key policy question in evaluating any liability standard is whether it actually tracks that purpose.

An effects-based test for monopolization claims does just this. As Professor Salop has explained, an effects-based test asks whether challenged conduct "reduces competition without creating a sufficient improvement in performance to fully offset" the resulting harm to consumers or other victims of anticompetitive conduct. Stephen C. Salop, *Exclusionary Conduct, Effect on Consumers, and the Flawed Profit-Sacrifice Standard*, 73 ANTITRUST L.J. 311, 330 (2006). It is "tightly focused on determining the impact on consumers." *Id.*

## B. An Intent Requirement Is Not Fit for Purpose.

A freestanding intent requirement asks the wrong question. It directs the court's attention to the defendant's state of mind rather than to what the conduct did to competition and consumers. As Salop puts the point, standards that turn on the defendant's mental state or internal calculus "are focused instead on the impact of the conduct on the alleged miscreant." *Id.* at 331. The statute protects consumers and

other victims of antitrust violations. A test that measures the defendant's purpose measures something else.

The mismatch is not merely conceptual. In the concentrated markets where Section 2 claims arise, intent to triumph over rivals is a constant, not a variable that separates lawful from unlawful conduct. Every firm that competes effectively intends to take sales from its rivals. *See* Hovenkamp, 61 OHIO ST. L.J. at 1039–40. A standard built on that constant cannot do the sorting the statute requires. That is why the Supreme Court has held that specific intent is not an element of completed monopolization, *see supra* Section I, and why making intent a threshold requirement would screen out conduct that demonstrably harms consumers merely because the plaintiff could not prove a mental state. An effects-based test avoids that error because it measures the thing the statute cares about. Intent retains only the evidentiary role *Aspen* described, and *Duke Energy* performed, helping to characterize ambiguous conduct after the effects inquiry is underway. 472 U.S. at 602; 111 F.4th at 367.

## C. An Intent Requirement Is Counterproductive Because Intent Evidence Can Be Manufactured and Suppressed.

There is a further, practical reason to reject an intent requirement: it rewards the defendants most capable of evading it. Anticompetitive purpose is often proved through the defendant's own documents and communications. A sophisticated firm can shape that record. It can train its employees to avoid the language that intent-based liability looks for, scrubbing the documentary trail while the underlying conduct and its effects remain unchanged. The result is a standard that turns not on what a firm did to competition but on how carefully its lawyers sanitized its vocabulary.

This is not hypothetical. In reporting around the recent Section 2 litigation against Google, journalists uncovered internal training materials instructing the company's workforce that certain words were off-limits in all written communications. Employees were told that terms like "market," "barriers to entry," and "network effects" were not to be used, to rely only on third-party data when describing the company's position in search, and to write "User Preference for Google Search" rather than "market share." Adrianne Jeffries, *To Head Off Regulators, Google Makes Certain Words Taboo*, The Markup (Aug. 7, 2020), https://themarkup.org/google-the-giant/2020/08/07/google-

30

documents-show-taboo-words-antitrust. The documents reportedly applied across the enterprise, from engineers to salespeople, and warned that every document should be assumed to become public. A standard keyed to anticompetitive intent invites precisely this kind of linguistic whitewashing. The more sophisticated the monopolist, the cleaner its files, and the easier its escape.

The point is not that such evidence, when it survives, is irrelevant. Candid admissions of exclusionary purpose can powerfully corroborate an effects-based showing, as the explicitly predatory messages did in *Duke Energy*. 111 F.4th at 367. The point is that the absence of such evidence proves nothing, because its absence may reflect coaching rather than innocence. A liability standard that requires the plaintiff to make a freestanding showing of intent hands a decisive advantage to the firms with the resources to manage their records. Effects cannot be scrubbed in the same way. Foreclosure of a more efficient rival, higher prices paid by purchasers, or delayed entry of competitors appear in the market regardless of what the defendant's employees were trained to write. A standard focused on effects reaches the conduct that matters

and cannot be evaded by careful drafting. An intent requirement fails to do so.

For all of these reasons, the district court's freestanding intent requirement is not only doctrinally wrong but bad policy. It substitutes a mental-state inquiry for the consumer-welfare inquiry the Supreme Court commands, and it does so in a way that systematically favors the most sophisticated wrongdoers.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court and remand for further proceedings.

Dated: June 22, 2026

Respectfully submitted,

/s/ *Kathleen Bradish*
Kathleen Bradish
American Antitrust Institute
1025 Connecticut Ave., NW
Suite 1000
Washington, DC 20036
(202) 304-0195
kbradish@antitrustinstitute.org

*Counsel for Amicus Curiae*
*American Antitrust Institute*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6118 words, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Kathleen Bradish*
Kathleen Bradish

# CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Kathleen Bradish*
Kathleen Bradish