No. 26-1248

# In the United States Court of Appeals for the Fourth Circuit

CAREFIRST OF MARYLAND, INC.; GROUP HOSPITALIZATION & MEDICAL SERVICES, INC.; CAREFIRST BLUECHOICE, INC.,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants,*

v.

JOHNSON & JOHNSON; JANSSEN BIOTECH, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 23-cv-629 (The Hon. Jamar K. Walker)

## REDACTED REPLY BRIEF OF PLAINTIFFS-APPELLANTS


THOMAS M. SOBOL
HANNAH W. BRENNAN
REBEKAH GLICKMAN-SIMON
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700

PETER D. ST. PHILLIP
URIEL RABINOVITZ
LOWEY DANNENBERG, PC
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500

MATTHEW W.H. WESSLER
MATTHEW GUARNIERI
STEFANIE OSTROWSKI
GUPTA WESSLER LLP
1400 16th Street, NW
Suite 225
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*

(*Additional counsel on inside cover*)

October 8, 2026

*Counsel for Plaintiffs-Appellants*

JOHN D. RADICE
RADICE LAW FIRM PC
475 Wall Street
Princeton, NJ 08540
(646) 245-8502

MARC C. GRECO
KIP A. HARBISON
GLASSER AND GLASSER PLC
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
(757) 625-6787

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Table of authorities ........ iii

Introduction ........ 1

Argument ........ 4

I. J&J's efforts to whitewash the district court's legal error on specific intent are unavailing. ........ 4

A. J&J mischaracterizes the decision below. ........ 4

B. J&J misunderstands basic antitrust law. ........ 6

1. Civil liability for monopolization does not require proof of consciousness of wrongdoing. ........ 6

2. The general-intent standard governs even when the anticompetitive conduct is a patent acquisition. ........ 9

3. J&J's policy arguments are irrelevant, wrong, and outweighed by countervailing considerations. ........ 10

C. Under the correct standard, this case should go to trial. ........ 12

D. J&J cannot substitute a new rationale on appeal for the flawed reasoning of the decision below. ........ 16

1. J&J's supposed procompetitive justifications are not a basis for summary judgment. ........ 16

2. J&J waived its *Noerr-Pennington* argument. ........ 18

3. In any event, *Noerr-Pennington* does not apply. ........ 19

II. J&J's *Walker Process* arguments only further confirm that the district court improperly resolved disputed issues of fact. ........ 22

A. A reasonable jury could find that J&J's misstatements and omissions were material. ........ 22

B. A reasonable jury could find that J&J intended to deceive the PTO. .......... 25

Conclusion .......... 27

# TABLE OF AUTHORITIES

## Cases

*2311 Racing LLC v. National Association for Stock Car Auto Racing, LLC*,
139 F.4th 404 (4th Cir. 2025) .......... 1

*American Calcar, Inc. v. American Honda Motor Co., Inc.*,
768 F.3d 1185 (Fed. Cir. 2014) .......... 26

*Amphastar Pharmaceuticals Inc. v. Momenta Pharmaceuticals, Inc.*,
850 F.3d 52 (1st Cir. 2017) .......... 20, 21

*Apotex Inc. v. UCB, Inc.*,
763 F.3d 1354 (Fed. Cir. 2014) .......... 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .......... 7

*Belcher Pharmaceuticals, LLC v. Hospira, Inc.*,
11 F.4th 1345 (Fed. Cir. 2021) .......... 24

*Bristol-Myers Squibb Co. v. Ben Venue Laboratories*,
90 F. Supp. 2d 522 (D.N.J. 2000) .......... 27

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .......... 19

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) .......... 15

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*,
637 F.3d 435 (4th Cir. 2011) .......... 10

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) .......... 19

*FTC v. Meta Platforms, Inc.*,
775 F. Supp. 3d 16 (D.D.C. 2024) .......... 17

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
748 F.3d 1326 (Fed. Cir. 2014) .......... 23

*In re Grand Jury Subpoena*,
204 F.3d 516 (4th Cir. 2000) .......... 14

*Intel Corp. v. Fortress Investment Group, LLC*,
2020 WL 6390499 (N.D. Cal. 2020) .......... 20

*Life Technologies, Inc. v. Clontech Laboratories, Inc.*,
224 F.3d 1320 (Fed. Cir. 2000) .......... 25

*McGuire Oil Co. v. Mapco, Inc.*,
958 F.2d 1552 (11th Cir. 1992) .......... 20

*NCAA v. Board of Regents of University of Oklahoma*,
468 U.S. 85 (1984) .......... 7

*Ohio Willow Wood Co. v. Alps South, LLC*,
813 F.3d 1350 (Fed. Cir. 2016) .......... 25

*Oksanen v. Page Memorial Hospital*,
945 F.2d 696 (4th Cir. 1991) .......... 17

*Peters v. Jenney*,
327 F.3d 307 (4th Cir. 2003) .......... 18

*Premier Electrical Construction Co. v. National Electric Contractors Association, Inc.*,
814 F.2d 358 (7th Cir. 1987) .......... 20

*SCM Corp. v. Xerox Corp.*,
645 F.2d 1195 (2d Cir. 1981) .......... 9, 15, 19

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) .......... 22

*Therasense, Inc. v. Becton, Dickinson & Co.*,
864 F. Supp. 2d 856 (N.D. Cal. 2012) .......... 25

*United Mine Workers of America v. Pennington*,
381 U.S. 657 (1965) .......... 19

*United States v. Aluminum Co. of America* (*Alcoa*),
148 F.2d 416 (2d Cir. 1945) .......... 4, 7, 8

*United States v. Griffith*,
334 U.S. 100 (1948) .......... 2, 7, 11

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......... 7, 8, 10, 11, 17

*United States v. Paramount Pictures*,
334 U.S. 131 (1948) .......... 7

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972) .......... 17

*United States v. United States Gypsum Co.*,
438 U.S. 422 (1978) .......... 8, 12

*Walton v. Harker*,
33 F.4th 165 (4th Cir. 2022) .......... 18

*White v. Rockingham Radiologists, Ltd.*,
820 F.2d 98 (4th Cir. 1987) .......... 17

**Constitutional provisions**

U.S. Const. amend. I. .......... 19

**Statutes & Regulations**

35 U.S.C. § 271 .......... 21

35 U.S.C. § 281 .......... 21

37 C.F.R. § 1.56 .......... 27

**Other authorities**

14 Phillip Areeda & Herbert Hovenkamp,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2020) .......... 10

2 Earl W. Kintner et al.,
*Federal Antitrust Law* (2025) .......... 6

ABA, Antitrust Law Section,
*Monopolization and Dominance Handbook* (2d ed. 2021) .......... 6

## INTRODUCTION

J&J persuaded the district court to enter summary judgment under a specific-intent standard that the company is now unwilling to defend. The district court misread *2311 Racing LLC v. National Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404 (4th Cir. 2025), to require proof not only that J&J engaged in anticompetitive practices that maintained its monopoly over the market for ustekinumab, but also that J&J "*intended* to exclude rivals on some basis other than efficiency." JA40 (emphasis added).[1] Although the district court was initially prepared to allow the case to proceed to trial even under that incorrect requirement, J&J successfully moved for reconsideration—doubling down on the court's legal error, which was the sole basis for the judgment below.

On appeal, J&J makes no effort to defend the specific-intent requirement that the district court wrongly drew from *2311 Racing* and that J&J took advantage of below. The company instead now claims (at 2) that the district court applied the "established … general-intent standard." But J&J's disingenuous reinterpretation can't be squared with the decision below.

If the district court had been merely applying the established general-intent standard, the court would not have candidly acknowledged that its approach was

[1] Unless otherwise specified, all internal quotation marks, emphases, alterations, and citations are omitted from quotations throughout this brief.

"inconsistent with Supreme Court precedent." JA40 n.19. J&J has no answer to that point—literally. Nowhere in its brief does J&J even acknowledge the language just quoted. And at least in this limited respect, the district court was correct: The specific-intent requirement it applied contradicts decades of settled Supreme Court precedent.

As the Federal Trade Commission explains, the district court "departed from [a] bedrock principle" of antitrust law by requiring proof that J&J "intended to exclude rivals." FTC Br. 1. Those same bedrock principles foreclose J&J's effort to rehabilitate the decision below by shifting the focus to its "knowledge" of future anticompetitive effects at the moment of the acquisition, rather than its intent. J&J's proposed approach is just specific intent in another guise, and it is equally wrong. The Supreme Court has made clear that, to prove monopolization, it is "sufficient" to show that the violation "results as the consequence of [the] defendant's conduct," without any further proof of intent or knowledge. *United States v. Griffith*, 334 U.S. 100, 105 (1948). If a monopolist engages in conduct that harms competition, including by acquiring patents that confer the power to exclude its rivals from the market, the monopolist violates Section 2.

J&J contends (at 2) that adhering to the general-intent standard would unfairly impose liability for "unwitting[]" or "accident[al]" conduct. Those policy concerns aren't implicated by the facts here—J&J knew what it was doing. J&J was already

scheming to exclude biosimilar competitors when it acquired Momenta, and it learned before the acquisition that Momenta's patents could be useful for making biosimilar versions of Stelara (and thus for excluding biosimilar rivals). And J&J was indisputably aware of the content of the Momenta patents when it later used them to prolong its monopoly beyond the lawful loss-of-exclusivity date.

More broadly, J&J's rhetoric about unwitting acquisitions ignores the other requirements for liability, including proof that the monopolist's conduct caused an antitrust injury. Here, J&J is liable for damages only because it successfully used the Momenta patents to exclude its competitors, delaying the introduction of more affordable versions of an important medication and forcing the certified class members to pay billions more than they would have paid in a competitive market.

J&J cannot avoid liability by invoking *Noerr-Pennington.* J&J waived any reliance on that doctrine by failing to raise it below as a basis for summary judgment. And even setting aside waiver, *Noerr-Pennington* does not shield a monopolist from liability for an anticompetitive patent acquisition. The acquisition is a sale of assets between two private parties that involves no petitioning whatsoever.

Finally, J&J has remarkably little to say about the district court's separate errors on *Walker Process* fraud. A reasonable jury could—and would—conclude that J&J committed *Walker Process* fraud when it told the FDA one thing and the PTO the opposite to deceive the latter into issuing the '307 patent.

## ARGUMENT

### I. J&J's efforts to whitewash the district court's legal error on specific intent are unavailing.

Decades of precedent establish that monopolization under Section 2 of the Sherman Act is a general-intent offense. The offense requires proof of the monopolist's "intent to do the act," not proof that the monopolist intended its conduct to be anticompetitive. *United States v. Aluminum Co. of Am.* (*Alcoa*), 148 F.2d 416, 432 (2d Cir. 1945). The Supreme Court, this Court, and other courts of appeals have long endorsed that understanding, and it is reflected in every leading antitrust treatise. CareFirst Br. 25-31; FTC Br. 7-12.

Faced with such a mountain of authority, J&J does not even attempt to defend the district court's specific-intent requirement. J&J instead claims (at 22-41) that the decision below actually rests on a general-intent standard. But to make that claim, J&J must mischaracterize the district court's reasoning and misrepresent the record. And if this Court rejects J&J's view and concludes that the district court applied a specific-intent standard, then J&J has offered no defense of the district court's sole reason for entering judgment in J&J's favor.

#### A. J&J mischaracterizes the decision below.

J&J's lead argument on appeal is that the district court did not do what the court said it was doing. In J&J's telling (at 23-24), although the district court's "initial framing of the inquiry" was stated in terms of intent, the court ultimately focused on

knowledge and did not "require proof that J&J acquired Momenta with the specific intent to exclude competition." The record belies J&J's gloss on the decision below.

Most obviously, J&J's reinterpretation cannot make sense of the district court's statement that the intent standard the court applied was "inconsistent with Supreme Court precedent." JA40 n.19. J&J never directly addresses that statement. Instead, J&J tries (at 35-36) to explain away the district court's lengthy footnote on intent as consistent with existing law. But the whole point of that footnote was that the court correctly perceived there to be a conflict between its approach and governing Supreme Court precedent. CareFirst Br. 31-34. The court forged ahead anyway based on a misreading of *2311 Racing*—a misreading that J&J nowhere defends.

J&J emphasizes (at 24) that the district court asked whether J&J had "knowledge … of Momenta's manufacturing patents" before acquiring them. JA43. But the court did so only because it viewed knowledge as a necessary condition for finding anticompetitive intent. JA42-45. The court was clear on that point in its reconsideration opinion: "CareFirst has not provided evidence upon which a reasonable jury could conclude that J&J had actual knowledge of the contents of the Momenta manufacturing patents *such that it could have intended to exclude rivals from any potentially relevant market*." JA64 (emphasis added). J&J partially quotes (at 23) that sentence but conveniently omits the italicized language.

J&J's arguments below are also inconsistent with its present position. In moving for reconsideration, J&J told the district court that the record did not contain sufficient evidence of "the specific purpose required under [the district] [c]ourt's standard: obtaining monopoly power for Stelara." JA4386. And J&J argued that it lacked "the requisite intent to monopolize." JA4392. J&J thus fully understood the court to have required proof of specific intent to monopolize. The judgment below rests solely on that legal error and should be reversed.

### B. J&J misunderstands basic antitrust law.

#### 1. Civil liability for monopolization does not require proof of consciousness of wrongdoing.

J&J seeks to salvage the decision below by arguing (at 26) that the company lacked general intent unless it "knew the facts that made its conduct allegedly anticompetitive." J&J misunderstands the general-intent standard.

The "textbook" rule is that a monopolist acts with "general intent" when it acts with the "intent to perform the exclusionary acts," regardless of whether it specifically intended for its conduct to have those exclusionary effects. 2 Earl W. Kintner et al., *Federal Antitrust Law* § 16.17 (2025). The "intent that matters" under the general-intent standard is "the intent to engage in monopolizing conduct," not "the intent to 'injure' competitors." ABA, Antitrust Law Section, *Monopolization and Dominance Handbook* § IV.A.3 (2d ed. 2021). Accordingly, a plaintiff can show general intent "by the very fact that the act is done, irrespective of the monopolist's motive,

purpose, or intent for the act to have anticompetitive consequences." FTC Br. 9. That is why Judge Hand famously observed that "no monopolist monopolizes unconscious of what he is doing." *Alcoa*, 148 F.2d at 432; *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (endorsing that proposition).

The Sherman Act does not demand proof that the monopolist knew, in advance, that its acquisition of monopoly power would have anticompetitive effects. As the Supreme Court long ago made clear, it is instead "sufficient" to prove that harm to competition was "the consequence of [the] defendant's conduct," without any "greater showing" about intent. *United States v. Griffith*, 334 U.S. 100, 105 (1948); *see United States v. Paramount Pictures*, 334 U.S. 131, 173 (1948) ("[T]he requisite 'purpose or intent' is present if monopoly results as a necessary consequence of what was done."). Indeed, a monopolist is liable for its anticompetitive conduct even if it acted from "good motives." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984).

J&J nonetheless insists (at 26-27) that focusing on a monopolist's mental state is necessary to avoid imposing liability for "historic accident[s]." J&J misunderstands that concept. The Sherman Act does not prohibit monopolies that result from "historic accident" in the sense that a firm finds itself with monopoly power *without* having engaged in anticompetitive conduct—for example, because of demand for the firm's "superior product." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).

But the Act draws that line based on conduct and effects—not intent or knowledge. *See id.; Alcoa*, 148 F.2d at 429; FTC Br. 18-19; Am. Antitrust Inst. Br. 13.

In arguing otherwise, J&J invokes (at 23, 26, 38) cases addressing the mens rea required for criminal liability. Those criminal cases have no bearing here. The Supreme Court confirmed as much in *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) (cited at J&J Br. 37-38). There, the Court held that "intent is an element of a criminal antitrust offense." *Id.* at 435. But it confirmed that its holding applied "solely" to "a criminal offense" and left "unchanged the general rule that a civil violation can be established by proof of either an unlawful purpose *or* an anticompetitive effect." *Id.* at 436 n.13 (emphasis added). That general rule governs this civil case.

*Gypsum* also demonstrates that J&J's proposed knowledge standard is "simply a back door to specific intent." FTC Br. 19 n.10. The Supreme Court explained in *Gypsum* that, in a criminal prosecution, the jury may infer specific intent from evidence that the defendant's conduct (1) had "anticompetitive effects" and (2) was "undertaken with knowledge of its probable consequences." 438 U.S. at 444 & n.21. Those are the same showings—anticompetitive effects and advance knowledge of the likelihood of those effects—that J&J would demand here (at 28-32), even while feigning not to require proof of specific intent.

### 2. The general-intent standard governs even when the anticompetitive conduct is a patent acquisition.

J&J next contends (at 27-28) that proof of the monopolist's knowledge should be required in patent-acquisition cases under *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981). But neither *SCM* nor any other case cited by J&J has ever endorsed the view that Section 2 imposes a special knowledge requirement in this context.

In *SCM*, the Second Circuit recognized that although the patent laws would ordinarily grant a patentholder lawful "exclusionary power," the situation is different when the patent acquisition was itself "unlawful" under the antitrust laws. 645 F.2d at 1206. J&J suggests (at 27) that *SCM* required proof of knowledge. But the court's reference to knowledge was merely a description of one obvious violation, not a requirement. *See SCM*, 645 F.2d at 1205 (explaining that "[s]urely" an antitrust violation occurs when, "for example," a firm acquires a patent knowing that the acquisition will increase its monopoly power). J&J likewise misconstrues (at 28) *SCM*'s discussion of acquisitions that "evolve into an economic monopoly." 645 F.2d at 1206. The Second Circuit concluded that if a firm does *not* possess monopoly power, it may acquire patent rights without triggering monopolization liability—even if the patent acquisition might "evolve into" (lead to) monopoly power in the future. *Id.*

Unlike the defendant in *SCM*, however, J&J was *already* a monopolist at the time it acquired the Momenta patents. *Cf. E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) ("Conduct that might otherwise be lawful may

be impermissibly exclusionary under antitrust law when practiced by a monopolist."). And "[a]cquisition *by a monopolist* of exclusive rights in related patents" is a prima facie violation of Section 2 "if the effect of the acquisition is to give the acquirer an exclusive right in them and this serves to increase or prolong the monopolist's market power." 14 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 707a (5th ed. 2020) (Areeda & Hovenkamp) (emphasis added). That theory does not require any proof of J&J's knowledge of the future anticompetitive effects of the acquisition.

### 3. J&J's policy arguments are irrelevant, wrong, and outweighed by countervailing considerations.

J&J asserts (at 36-41) that adhering to the established general-intent standard would be unfair to monopolists. J&J's policy concerns cannot justify disregarding binding Supreme Court precedent. They are also baseless.

**a.** Section 2 of the Sherman Act does not create any form of "strict liability." *Contra* J&J Br. 36-37. J&J ignores all the hurdles a plaintiff must overcome in a case like this one—including proving monopoly power, anticompetitive effects, and antitrust injury. 14 Areeda & Hovenkamp ¶ 707a; FTC Br. 20; *cf. Grinnell Corp.*, 384 U.S. at 570-71. And even if a given patent acquisition has anticompetitive effects, the monopolist may try to show countervailing procompetitive benefits. 14 Areeda & Hovenkamp ¶ 707f. None of that remotely resembles a regime of strict liability.

Here, J&J held onto the Momenta patents for years after acquiring them and then deliberately used them to exclude biosimilar competitors, causing CareFirst and other class members to pay supra-competitive prices. JA45-48. The injuries that J&J caused were not an inevitable result of the acquisition itself. J&J could have avoided any liability by divesting the patents or licensing them on non-exclusionary terms.

**b.** The "three foundational principles" that J&J invokes (at 38-39) reflect its own errors, not sound antitrust law. As explained above, J&J misunderstands the case law about "accident[al]" monopolization, which refers to achieving or maintaining a monopoly without engaging in anticompetitive conduct (unlike here). *Grinnell Corp.*, 384 U.S. at 570-71; *supra* 7-8. J&J's reliance (at 39) on *Aspen Skiing* is likewise misplaced. Evidence of intent can be used to prove or disprove anticompetitive effects without being required in all monopolization cases. And J&J is wrong to assert (at 39) that the defendants in the key cases all "knew that their conduct was exclusionary." In *Griffith*, for example, the Supreme Court "accept[ed] … that [the defendants] had no intent or purpose … to monopolize," but nonetheless found that they could be held liable. 334 U.S. at 106.

**c.** Requiring proof of specific intent would be a recipe for gamesmanship, particularly in cases involving patent acquisitions. CareFirst Br. 39-41. Sophisticated firms can "train [their] employees to avoid" inculpatory language and "scrub[] the documentary trail" to avoid detection. Am. Antitrust Inst. Br. 30; *see* COSAL Br. 18.

J&J's approach would thus allow monopolists to maintain their monopolies "through improper means—and with impunity—by fostering the impression that they acted with ignorance or good intentions." Open Markets Inst. Br. 13. J&J has no meaningful response to those concerns.

### C. Under the correct standard, this case should go to trial.

A reasonable jury could conclude that J&J acted with general intent to acquire the Momenta patents because "J&J bought those patents." FTC Br. 20. And J&J indisputably knew it was acquiring the patents because they were all identified to J&J beforehand in merger documents. JA5 (undisputed fact ¶ 17).

J&J asserts (at 38) that "[y]ou cannot have general intent to do something if you do not know you are doing it." But J&J knew it was buying the Momenta patents and accordingly intended to do so—just as a person who buys a book intends to acquire it, regardless of whether the person already knows the book's contents (an example J&J never attempts to refute). CareFirst Br. 38. The additional requirement that J&J seeks to impose here is not about whether J&J knew it was acquiring the patents, but rather whether J&J knew it could use them for an anticompetitive purpose. And as explained above, the Supreme Court has long rejected any such requirement in civil monopolization cases. *See Gypsum*, 438 U.S. at 436 n.13; *supra* 8.

The district court's legal error on specific intent warrants reversal. But even if J&J were correct that it cannot be held liable absent evidence that it was aware,

before the acquisition, that the Momenta manufacturing patents could be used to exclude potential competitors, summary judgment was still unwarranted. A reasonable jury could conclude that J&J had that knowledge.

[redacted] CareFirst Br. 9-10. Denise DeFranco, J&J's Global Head of IP Litigation, admitted at her deposition that [redacted] JA3688. [redacted] JA4082-4092. The date is significant. [redacted] JA4454; *see* JA1777, JA4335. Perhaps there is an innocent explanation for that staggeringly unlikely coincidence. But J&J has never offered one, and the summary-judgment standard requires viewing the evidence in the light most favorable to CareFirst. A reasonable jury could conclude [redacted][2]

[2] J&J has refused to disclose the content of the June 26 email on privilege grounds, but the email's subject line referred [redacted] In granting J&J's motion for reconsideration, the district court ruled that the subject line of the June 26 email would be excluded from evidence to

Other evidence bolsters that same inference. For example, before the deal closed, [redacted] CareFirst Br. 21; *see* JA4423, JA4437. J&J says (at 30) that [redacted] JA4422; *see* JA4454-4455. J&J also says (at 30) that [redacted] A reasonable jury could infer from the materials that Momenta made available to J&J that J&J knew it would be acquiring IP that covered methods of making competing versions of ustekinumab before the deal closed.

To the extent the record lacks additional direct evidence of J&J's knowledge, that is because J&J asserted attorney-client privilege and blocked discovery into when its employees first learned of the contents of the Momenta patents. J&J is wrong to assert (at 30) that "[t]here is no dispute" about J&J's privilege claims. In fact,

---

avoid any adverse inference about the content of the email. JA61-62. But the attorney-client privilege does not cover the fact that the email occurred or its general subject matter. *See, e.g.*, *In re Grand Jury Subpoena*, 204 F.3d 516, 520 (4th Cir. 2000); ECF 916 at 7-8. In any event, the district court's evidentiary ruling was interlocutory and should be reconsidered on remand in connection with CareFirst's motion to preclude J&J from misusing attorney-client privilege. JA4352.

CareFirst filed a motion in limine to preclude J&J from putting its putative lack of knowledge at issue while using attorney-client privilege to prevent any discovery of its knowledge. JA4356-4357. J&J ignores that privilege dispute, which will remain a live issue for the district court to resolve on remand. Adopting J&J's approach would lead to the same kinds of disputes over and over again. Any inquiry into a monopolist's knowledge of the contents of patents that it acquires will inevitably implicate discussions with counsel—a point J&J doesn't rebut.

Focusing only on what J&J knew before the acquisition would also contravene this Court's instruction that a monopolization scheme must be "considered as a whole." CareFirst Br. 38 (quoting *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024)). J&J counters (at 31) that liability turns on whether the patent acquisition was unlawful "at the time" the acquisition closed. *SCM*, 645 F.2d at 1207. But J&J's later conduct is essential to assessing the anticompetitive effects of its acquisition. J&J could have divested the Momenta patents or chosen not to assert them; instead, J&J held onto the patents for years and then used them to keep biosimilars off the market. And there's no dispute that J&J knew about the contents of the patents when it asserted them to exclude its rivals and harm competition.

Finally, J&J argues (at 32-33) that it cannot be held liable absent proof that it already knew how its competitors would manufacture their biosimilars. As the district court recognized, "[t]his is not a persuasive argument." JA45 n.20. Buying up

patents that could be used to make competing products was anticompetitive conduct even if J&J was not yet certain that its gambit would work. *See id.*

### D. J&J cannot substitute a new rationale on appeal for the flawed reasoning of the decision below.

The judgment below rests solely on the district court's legal error on specific intent. On every other important issue, the court was prepared to try the case. JA10-39, JA45-48, JA69-74. Accordingly, if this Court rejects the district court's specific-intent standard, the case should be remanded for trial. J&J should not be allowed to substitute a new rationale on appeal for the flawed decision that it procured below. In any event, J&J's arguments for affirmance on alternative grounds all fail.

#### 1. J&J's supposed procompetitive justifications are not a basis for summary judgment.

J&J contends (at 41-46) that summary judgment was warranted under the burden-shifting framework for monopolization liability. Yet that framework cuts against J&J at every step.

At the first step, a reasonable jury could conclude that J&J's acquisition of the Momenta patents "had anticompetitive effect" by resulting in the exclusion of biosimilar competitors. JA45 n.21. J&J's only response (at 42) is that the exclusion happened later, after the '734 patent expired. But the Sherman Act prohibits the "maintenance of [monopoly] power" by anticompetitive means. *Grinnell Corp.*, 384

U.S. at 571. When J&J acquired the Momenta patents during the life of its '734 patent, it was taking anticompetitive steps to maintain its monopoly after that patent expired.

J&J next claims (at 43-44) that the deal was "procompetitive." But J&J has never offered any procompetitive rationale for its acquisition *of the Momenta patents*, which is the relevant inquiry—not J&J's acquisition of nipocalimab. An antitrust defendant cannot foreclose competition "with respect to one sector of the economy" based on its belief that "such foreclosure might promote greater competition in a more important sector of the economy." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 69 (D.D.C. 2024) (explaining the general rule against "recognizing out-of-market procompetitive justifications"). Thus, J&J cannot justify foreclosing competition in the market for ustekinumab by touting the supposed benefits to consumers of its acquisition and development of nipocalimab in a different product market.

Whether J&J's "business rationale" for the deal was to acquire nipocalimab is irrelevant. *Contra* J&J Br. 44-46. No amount of proof on that issue could justify summary judgment because monopolization is not a specific-intent offense. This Court's decisions in *Oksanen v. Page Memorial Hospital*, 945 F.2d 696 (4th Cir. 1991) (en banc), and *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98 (4th Cir. 1987), do not suggest otherwise. Both are forerunners of the modern burden-shifting framework, *see* FTC Br. 16-18, and that framework does not permit summary judgment here.

Lastly, even if J&J could rely on the supposed procompetitive benefits of its acquisition of nipocalimab, summary judgment would still be unwarranted. A reasonable jury could conclude that J&J could have achieved all its claimed benefits through less exclusionary means. In particular, J&J could have acquired nipocalimab but divested the Momenta manufacturing patents—or simply shelved them, or licensed them on terms not requiring competitors to stay off the market. J&J asserts (at 46-47) that taking into account those alternatives would somehow violate *Noerr-Pennington*, but *Noerr-Pennington* does not apply here for the reasons discussed below.

### 2. J&J waived its *Noerr-Pennington* argument.

J&J alternatively contends (at 47-52) that this Court should affirm on the theory that *Noerr-Pennington* precludes holding J&J liable. This argument is waived. Although J&J had every opportunity to invoke *Noerr-Pennington* in its summary-judgment briefing below, it chose not to do so. *See* JA2282-2327. This Court ordinarily will not affirm summary judgment "on grounds raised by an appellee for the first time on appeal." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003); *cf. Walton v. Harker*, 33 F.4th 165, 175 (4th Cir. 2022) (observing that, as a "general rule," "a federal appellate court does not consider an issue not passed upon below").

### 3. In any event, *Noerr-Pennington* does not apply.

**a.** Even setting aside J&J's waiver, *Noerr-Pennington* does not shield J&J's acquisition of the Momenta patents and therefore does not provide any basis for affirmance.

The *Noerr-Pennington* doctrine is rooted in the First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. In *Noerr*, the Supreme Court held that the Sherman Act does not apply to efforts to persuade lawmakers to adopt policies that harm competition. The Court reasoned that Congress did not intend for the Act to "deprive the people of their right to petition." *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139 (1961). The Court later extended the same logic to petitioning other branches of government. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-70 (1965) (agencies); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) (courts).

*Noerr-Pennington* does not shield J&J's anticompetitive conduct in this case for the simple reason that the act at issue—acquiring the Momenta patents—did not involve petitioning the government. The acquisition was a private transaction. And like other private transactions, the acquisition of a patent is not "immune from the antitrust laws." *SCM*, 645 F.2d at 1205; *see* JA262-263 & n.12 (citing cases).

**b.** J&J contends (at 49) that *Noerr-Pennington* applies here because this case is "not really" about J&J's acquisition of the Momenta patents but instead only J&J's

later assertion of those patents. That is wishful thinking. Although litigation was a means by which J&J reaped the rewards of its anticompetitive acquisition, *Noerr-Pennington* does not shield a monopolist from liability in these circumstances.

As the First Circuit has explained, "[t]he mere existence of a lawsuit" in the chain of events causing the plaintiff's antitrust injury "does not retroactively immunize prior anti-competitive conduct." *Amphastar Pharm. Inc. v. Momenta Pharm., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017). Thus, although *Noerr-Pennington* generally forbids "using litigation" *itself* as the basis for Sherman Act liability, *Noerr-Pennington* does *not* forbid "awarding damages for efforts to use the courts" as part of a broader anticompetitive scheme. *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 374 (7th Cir. 1987); *see also Intel Corp. v. Fortress Inv. Grp., LLC*, 2020 WL 6390499, at *14-16 (N.D. Cal. 2020) (reviewing extensive case law).

Here, the relevant anticompetitive conduct was J&J's acquisition of patents covering technologies for manufacturing competitor biosimilar drugs. Although Momenta had developed those technologies to *facilitate* competition, J&J's acquisition of the patents enabled the company to do the opposite. CareFirst Br. 9. And J&J can be held liable for the downstream injuries that its patent acquisition caused, even if J&J enforced its acquired rights through "the institution of … litigation." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1561 (11th Cir. 1992) (discussing *Premier*, 814 F.2d at 373).

J&J argues (at 51) that *Amphastar* is distinguishable, but the case is directly on point. In both that case and this one, a monopolist engaged in non-petitioning conduct—there, deception of a standard-setting body—that caused antitrust injury only after the monopolist also later engaged in litigation. *See Amphastar* 850 F.3d at 55-56. The First Circuit correctly held that *Noerr-Pennington* does not shield a monopolist from liability in those circumstances. *Id.* at 57-58.

Any other rule would shield all patent acquisitions from Sherman Act liability. The exclusionary force of a patent comes from the ability to sue for infringement. 35 U.S.C. §§ 271, 281. If J&J's expansive conception of *Noerr-Pennington* were correct, a monopolist would always be able to say that the exclusionary effects of a given patent acquisition depended on enforcement of the patents in litigation. But even J&J recognizes (at 50) that some patent acquisitions violate the Sherman Act.

**c.** J&J briefly argues (at 51) that its conduct did not cause the plaintiffs' injuries because biosimilars "remained free to launch." As the district court explained, however, a reasonable jury could find causation. JA47-48. Biosimilar manufacturers agreed to delay their launches for months in exchange for a license to the Momenta and '307 patents. If J&J had not acquired and held onto the Momenta patents, biosimilars would not have agreed to those same delays.

## II. J&J's *Walker Process* arguments only further confirm that the district court improperly resolved disputed issues of fact.

J&J does not contest the district court's conclusion that a reasonable jury could find that J&J committed *Walker Process* fraud during its prosecution of the '307 patent. JA26. J&J nonetheless argues (at 52-60) that the court was correct to narrow the scope of the fraud that the jury can consider. But J&J's arguments only confirm that the district court improperly resolved disputed issues of fact about materiality and intent to deceive—issues that should be included in the jury trial.

### A. A reasonable jury could find that J&J's misstatements and omissions were material.

***Omissions.*** In 2016, J&J told the FDA that public scientific literature made it "reasonable to assume" that ustekinumab would be effective in treating ulcerative colitis. JA1509; *see* JA1716. That representation was contained in a clinical trial protocol and related report that J&J employees used—in 2018—to draft the background section of the '307 patent. But in preparing that application for the PTO, J&J's patent agent, Luis Ralat, *omitted* the statement about the "reasonable" expectations of success and the citations to scientific studies supporting that expectation. JA1713-1735. The omissions were material: A reasonable jury could conclude that the PTO "would not have allowed" J&J's application "had [the PTO] been aware of" what J&J told the FDA years prior. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). J&J has three responses, but none works.

*First*, J&J contends (at 54) that it didn't omit these statements because the protocol itself was "before the Examiner." But J&J never disclosed the protocol to the examiner, nor did it ever "tell [him] where to find it." *Contra* J&J Br. 58. Whether the examiner found and reviewed the protocol on his own is a genuine dispute of fact that cannot be resolved at summary judgment.

The examiner listed the materials he reviewed, including the general webpage for the relevant trial on clinicaltrials.gov. But—crucially—his list did *not* include the clinical protocol. JA1388. As J&J's expert admitted, the protocol had a unique URL, JA517, which the examiner presumably would have listed if he had accessed and reviewed the protocol. Indeed, he did just that when he denied a later J&J patent application. ECF 593-2 at 122. The jury could also reasonably conclude that the examiner visited an earlier version of the website from which it was not possible to access the clinical protocol. JA2590-2596.

*Second*, J&J contends (at 54-55) that its omissions were not material because other documents before the examiner said similar things. But even in J&J's own chart, there is nothing equivalent to the protocol's statement that it was "reasonable to assume" that ustekinumab would be effective in treating ulcerative colitis. That statement directly undermines J&J's application because the legal standard for obviousness turns on a scientist's "reasonable expectation of success." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014); CareFirst Br. 44.

*Third*, J&J contends (at 55-56) that the "reasonable to assume" omissions were not material because they reflected only J&J's subjective expectation of success. But the clinical protocol was—by its own terms—describing the *state of the art*, including what scientists knew about "the similarities in the genetics and biology of [ulcerative colitis] and Crohn's disease." JA1509. And a jury could find the omissions material even if (contrary to fact) they had been framed in terms of J&J's subjective expectations; disclosing such statements would have materially undercut J&J's later representations regarding the application's novelty. CareFirst Br. 46-47.

***Misrepresentations.*** J&J also misled the PTO by telling the examiner that there was *no* reasonable expectation that ustekinumab would be effective to treat ulcerative colitis, despite having told the FDA the opposite. CareFirst Br. 11-12, 44. According to J&J (at 57), those statements can't be fraud because they were attorney arguments. But Dichter's statements went beyond "mere advocacy"; they were "factual in nature and contrary to the true information" in the clinical protocol. *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014).

Such contradictory statements can constitute fraud on the PTO, even when made by an attorney. *See Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1348-53 (Fed. Cir. 2021) (argument to PTO characterizing importance of feature differentiating chemical process from prior art was "material" where it was "directly at odds" with a prior argument made to the FDA); *Ohio Willow Wood Co. v. Alps S.,*

*LLC*, 813 F.3d 1350, 1358 (Fed. Cir. 2016) (attorney argument held to be materially misleading); *Therasense, Inc. v. Becton, Dickinson & Co.*, 864 F. Supp. 2d 856, 861-63 (N.D. Cal. 2012) (similar).[3]

J&J protests (at 60 n.8) that *Belcher* and *Therasense* are "inapposite" because the applicants in each case took a "directly contradictory" position before two authorities. So did J&J. It told the FDA that it was "reasonable to assume" that the clinical trial would succeed and then told the PTO that there was no reasonable expectation of the trial's success.

### B. A reasonable jury could find that J&J intended to deceive the PTO.

According to J&J (at 58), there is "no evidence that any duty-bound J&J employee" acted with an intent to deceive. But as the district court recognized, a reasonable jury could conclude that intent to deceive is the "single most reasonable inference" from the fact that Ralat "deleted" content from the clinical trial protocol that contradicted J&J's novelty position when drafting the application. JA36-38.

J&J never explains why that same inference doesn't also apply to the omissions at issue here. The company insists (at 58) that no reasonable jury could infer deceptive intent because J&J "t[old] the Examiner where to find" the protocol. It

[3] J&J's cases (at 57) do not suggest otherwise. Those cases address attorney argument about a *disclosed* reference. *See, e.g.*, *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000). But here, J&J withheld the protocol and then made contradictory statements to the examiner about the state of the art.

didn't. After the examiner found the trial website on his own and raised it with J&J, J&J listed only the *website*—not the *protocol*—on a subsequent information disclosure statement. JA1397-1399, JA1425. And the inference of intent to deceive is all the stronger because J&J submitted a different and less relevant clinical trial protocol to the examiner—one for J&J's clinical trial of Stelara to treat lupus. JA1399; CareFirst Br. 50.

J&J also argues (at 59) that Ralat lacked intent to deceive because he didn't "delete" anything from the protocol. There is no meaningful difference between copying-and-pasting the entire text of the protocol and then deleting the parts J&J wanted to hide, and selectively copying-and-pasting to omit those same parts. The deception is the same. And such an "intentionally selective" disclosure can show intent to deceive. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1190 (Fed. Cir. 2014); *see* CareFirst Br. 48-49. Although J&J claims (at 59) to have offered a "competing explanation for Ralat's drafting decisions," it never says what that explanation is. The only explanation in the record is the one that Ralat himself gave: J&J's "goal" before the PTO (getting a patent) was different than its "goal" before the FDA (skipping to phase 3 trials). CareFirst Br. 49-50.

J&J insists (at 58-59) that Ralat's intent is "irrelevant" because he had "no role in prosecuting the '509 Application." Not so. Ralat prepared the provisional application that led to the '509 application. JA1733-1735, JA4141-4144. He owed the

PTO a duty of candor with respect to that application. *See* 37 C.F.R. § 1.56(a) (duty of candor extends to "[e]ach individual associated with the filing and prosecution of a patent application"); *cf.* JA2573-2577. J&J's patent agent, Eric Dichter, supervised Ralat and read the clinical protocol that J&J failed to disclose. ECF 530-7 at 4-6, 54-55. Thus, a jury could reasonably find that either (or both) Ralat or Dichter acted with intent to deceive when preparing the '509 application.

Finally, J&J reprises (at 60) its argument that Dichter's own statements were merely "attorney arguments." But "there is a line between legitimate advocacy" and "advocacy that the applicant surely knows has a propensity to mislead the examiner." *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 522, 533 (D.N.J. 2000). Dichter's statements fall into the latter camp.

## CONCLUSION

The district court's judgment should be vacated and the case remanded for further proceedings.

Respectfully submitted,

*/s/ Matthew M.H. Wessler*

MATTHEW W.H. WESSLER
MATTHEW GUARNIERI
STEFANIE OSTROWSKI
GUPTA WESSLER LLP
1400 16th Street, NW
Suite 225
Washington, DC 20036
(202) 888-1741
*matt@guptawessler.com*

THOMAS M. SOBOL
HANNAH W. BRENNAN
REBEKAH GLICKMAN-SIMON
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
(617) 482-3700

PETER D. ST. PHILLIP
URIEL RABINOVITZ
LOWEY DANNENBERG, PC
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500

JOHN D. RADICE
RADICE LAW FIRM PC
475 Wall Street
Princeton, NJ 08540
(646) 245-8502

MARC C. GRECO
KIP A. HARBISON
GLASSER AND GLASSER PLC
Crown Center, Suite 600
580 East Main Street
Norfolk, VA 23510
(757) 625-6787

October 8, 2026

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,490 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

October 8, 2026

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2026, I electronically filed sealed and redacted public versions of the foregoing reply brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. I further certify that I caused a copy of the sealed version of the brief to be served via email, with prior written consent, to the following counsel of record:

George G. Gordon (george.gordon@dechert.com)
Michael H. McGinley (michael.mcginley@dechert.com)
Julia E. Chapman (julia.chapman@dechert.com)
David M. Costigan (david.costigan@dechert.com)
Dechert, LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808

Steven A. Engel (steven.engel@dechert.com)
Dechert LLP
1900 K Street NW
Washington, DC 20006-1110

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler